UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                              :
CURTIS VAN STUYVESANT,
                                                              :        03 Civ. 3856 (LAK) (DF)
                                        Petitioner,
                                                              :        **REPORT AND**
      -against-                                                        **RECOMMENDATION**
                                                              :
JAMES CONWAY, Superintendent,
Attica Correctional Facility,                                 :

                                        Respondent.           :
------------------------------------------------------------------X

**TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:**

### INTRODUCTION

*Pro se* petitioner Curtis Van Stuyvesant ("Petitioner"), seeking a writ of habeas corpus

under 28 U.S.C. § 2254, challenges his conviction in New York Supreme Court, Bronx County.

Upon a jury verdict, Petitioner was found guilty of two counts of Scheme To Defraud in the First

Degree, in violation of N.Y. Penal L. § 190.65(1)(a), (b); four counts of Grand Larceny in the

Third Degree, in violation of N.Y. Penal L. § 155.35; four counts of Grand Larceny in the Fourth

Degree, in violation of N.Y. Penal L. § 155.30(1); two counts of Attempted Grand Larceny in the

Third Degree, in violation of N.Y. Penal L. §§ 110.00/155.35; and one count of Practicing or

Appearing as an Attorney at Law Without Being Admitted and Registered, in violation of N.Y.

Judiciary L. § 478.  (*See* Respondent's Memorandum of Law in Opposition to Petition For a

Writ of Habeas Corpus, dated November 7, 2003 ("Resp. Mem."), at 1.)  Petitioner was

sentenced to concurrent prison terms of one and one-third to four years on the two counts of

Scheme To Defraud, to run consecutively to prison terms of two and one-third to seven years on

each of the four counts of third degree Grand Larceny, and one and one-third to four years on

each of the remaining counts of Grand Larceny and Attempted Grand Larceny.  (*See id.* at 2.)

Petitioner was also sentenced to a prison term of one year on the count of practicing as an

attorney without a license, which merged with his other prison terms.  (*Id.*)  In accordance with

N.Y. Penal L. § 70.30(1)(e)(i), Petitioner's sentence was reduced to an aggregate prison term of

10 to 20 years.  (*Id.*)  At the time he filed his habeas petition, Petitioner was incarcerated at the

Attica Correctional Facility ("Attica"), in Attica, New York (*see* Pet.; Trav.),[1] but he is currently

incarcerated at the Collins Correctional Facility ("Collins") in Collins, New York.[2]

In his petition, as amplified by his accompanying 233-page submission setting forth legal

argument on his claims, Petitioner contends that he was deprived of the right to a constitutionally

fair trial and state appellate process on the following 18 grounds:

(1)    The trial court improperly exercised jurisdiction over Petitioner, as only federal
       court had proper jurisdiction;

(2)    Petitioner's rights were violated based on the following misconduct by the
       prosecution:

       a.    The failure to turn over exculpatory evidence, which violated Petitioner's
             rights under *Brady v. Maryland*, 373 U.S. 83 (1963); and

       b.    The manufacturing and use at trial of false evidence, which violated
             Petitioner's due process rights;

(3)    Petitioner's due process rights and rights under *People v. Rosario*, 9 N.Y.2d 286,
       213 N.Y.S.2d 448 (1961), were violated when the prosecution withheld prior
       statements by witnesses;

---

[1] "Pet." refers to Petitioner's petition under 28 U.S.C. § 2254, dated March 9, 2003.
"Trav." refers to Petitioner's traverse, dated November 20, 2003.

[2] Petitioner was transferred to Collins after he filed his petition, which names as
respondent the Superintendent of Attica.  Although under Rule 2(b) of Rules Governing Section
2254 Cases in the United States District Courts, the Superintendent of Collins would now be the
appropriate respondent in this matter, the substitution would not affect the Court's analysis of
Petitioner's claims.

(4)     Petitioner's conviction was not supported by legally sufficient evidence, and the jury's verdict was against the weight of evidence;

(5)     Petitioner's 14th Amendment right to be free from unreasonable search and seizure was violated;

(6)     Petitioner was denied his due process rights because of deficiencies in the grand jury process;

(7)     Petitioner's right to effective assistance of counsel was violated because his stand-by counsel:

    a.     failed to investigate;

    b.     colluded with the District Attorney's Office to violate his rights under *Batson v. Kentucky*, 476 U.S. 79, 93-97 (1986);

    c.     violated Petitioner's rights under the Confrontation Clause and his right to compulsory process;

    d.     prevented defense witnesses from testifying;

    e.     prevented Petitioner from entering defense exhibits;

    f.     prevented Petitioner from accepting mistrial offers; and

    g.     acted under a conflict of interest;

(8)     Petitioner was denied his right of compulsory process to subpoena witnesses because prosecutors intimidated witnesses;

(9)     Petitioner was denied his constitutional right to confront the prosecution's witnesses;

(10)    Petitioner's claims were sufficiently preserved for appellate review, and the Appellate Division violated his due process rights by holding that many of his claims were unpreserved or unreviewable;

(11)    Petitioner's Fifth Amendment right not to testify was violated when the prosecution implied in summation that the jury could infer guilt from Petitioner's decision not to testify;

(12)    Petitioner's rights under *Batson* were violated by the prosecution's exclusion of educated, white men from the jury;

(13)    Petitioner's Sixth and 14th Amendment rights were violated as a result of "tampering" with the jury by the prosecution and the trial court;

(14)    Petitioner's identification by witnesses at trial was improperly "bolstered" by the prosecution;

(15)    The trial court erred by failing to give the jury an alibi charge;

(16)    Petitioner has exhausted his claims in state court;

(17)    Petitioner was prevented from presenting an effective appeal because the trial transcript provided to him was incomplete; and

(18)    Petitioner was denied his rights to a speedy trial and speedy appeal, and was denied his due process rights because of a pre-indictment delay.

Respondent argues that the majority of Petitioner's claims are procedurally barred, but that all are, in any event, without merit.  For the reasons discussed below, I recommend that the petition be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    Petitioner, Who Was Not Authorized to Practice Law, Held Himself Out as an Immigration Attorney.

From March 1997 to February 1998, Petitioner advertised his services as an immigration attorney in newspapers distributed in New York City and on a New York City radio station.[3] (Transcript of proceedings held on May 19, 1999 before the Honorable John Stackhouse ("Tr. Vol. I"), at 3-11, 27-33.)  Specifically, from March 1997 to February 1998, Petitioner purchased advertising space in Carribean Life, a newspaper distributed in New York City targeting readers of Caribbean descent.  (*Id.* at 3,11.)  Petitioner's advertisement read, in part:  "If you have lived in the United States for ten years or more, you can file for your green card.  You do not need a sponsor.  You may be eligible to have your deportation suspended and become an alien lawfully

---

[3] Petitioner chose the content for each advertisement.  (Tr. Vol. I at 160.)

admitted into the United States." (*Id.* at 22.) This advertisement directed readers to a supposed

law firm named "Fox, Stewart, Van Stuyvesant, Harrison and Tate," which the advertisement

described as "immigration lawyers" located at 93 Worth Street, Suite 803, New York, New

York. (*Id.* at 16-17.)

Petitioner also advertised on the Manhattan radio station WLIB, whose target audience

included people of Carribean descent. (*Id.* at 27-33.) One advertisement stated: "If you need

legal assistance with immigration problems, the law firm of Fox, Stewart, Van Stuyvesant,

Harrison and Tate offers expert, honest services at a fair price. They can help with green cards,

citizenship, reentry permits, family reunification, labor certifications, visa petitions and more."

(*Id.* at 32.) That advertisement also directed listeners to the firm's telephone numbers. (*Id.*)

Petitioner placed similar advertisements in radio "billboards," which are paragraphs read at the

beginning and end of radio programs. (*Id.* at 33A.) Petitioner's "billboards" on the Caribbean

American Morning Show directed listeners to call the "law firm" of Fox, Stewart, Van

Stuyvesant, Harrison and Tate for "expert legal assistance" with immigration problems. (*Id.* at

33 A-B.) Finally, Petitioner placed a 60-second commercial on the radio for Fox, Stewart, Van

Stuvesant, Harrison and Tate, which included this statement: "If you have lived in the U.S. for

ten years or more, you can file for your green card without need of a sponsor. You may be able

to have your cancellation or removal suspended and become an alien lawfully admitted to the

United States for permanent residence." (*Id.* at 33 B-C.)

According to the testimony at trial, at least some of Petitioner's advertisements

incorrectly stated the requirements under immigration law for obtaining permanent residency

status or relief from deportation proceedings. (*Id.* at 58-60.) Petitioner's May 20, 1997

advertisement in Carribean Life, for example, referred to a repealed law allowing for the

suspension of deportation proceedings under certain circumstances; it did not mention a new, more stringent law already in effect.  (*Id.*)  Moreover, Petitioner's advertisements failed to mention certain requirements for obtaining permanent residency status or relief from deportation proceedings, making it appear, for example, as though a person could qualify for relief solely by residing continuously in the United States for 10 years, without needing to be sponsored by a qualifying relative, as actually required for eligibility.  (*Id.*)

At trial, an employee of the New York State Office of Court Administration, Tony Lynch, testified that New York State law required all attorneys admitted to practice law in New York State since 1920 to register with the New York State Office of Court Administration. (Transcript of proceedings held on May 24, 1999 before the Honorable John Stackhouse ("Tr. Vol. II"), at 313, 318, 321.)  On May 5, 1999, Lynch searched the list of all attorney registration records through April 30, 1999, but did not find a record for Petitioner.  (*Id.* at 314-15.)  Nor did Lynch find any evidence that Petitioner was admitted *pro hac vice* anywhere in New York State (*id.* at 357) or that a law firm named Fox, Stewart, Van Stuyvesant, Harrison and Tate existed (*id.* at 317-18).

In addition, the evidence at trial showed that Petitioner was not authorized to practice law before an immigration judge as a non-attorney.  Wen Cheng, an Assistant District Counsel with the Immigration and Naturalization Services ("I.N.S."), testifying as an expert in immigration law (Tr. Vol. I at 52), explained that only four categories of people were authorized to practice law before immigration judges:  (1) licensed and admitted attorneys; (2) law students (or law graduates) in law school clinic programs or working with a Legal Aid-type service and not receiving pay; (3) individuals considered to be of good repute with the court, and pre-authorized by the immigration court; and (4) accredited representatives recognized by the Board of

Immigration Appeals, who were typically individuals working with organizations like Legal Aid or Catholic Charities. (*Id.* at 37-39, 80.) Petitioner did not fall into any of these categories. (*Id.* at 38-40, 93, 120-121, 126; Tr. Vol. II at 314-15, 357.)

### B.    Petitioner Maintained a Law Office and Accepted Payments from Clients to Represent Them in Immigration Matters.

Petitioner maintained an office in Manhattan at 93 Worth Street, and rented office space for limited use at 237 Park Avenue. (Tr. Vol. I at 147, 164, 178; Tr. Vol. II at 295, 297, 299-300.) In or around September or October 1997 to May 1998, Petitioner employed Antonio Fortune to work in the "law firm" – as Petitioner described it – of Fox, Stewart, Van Stuyvesant, Harrison and Tate, in which Petitioner claimed he was a partner.[4] (Tr. Vol. I at 147, 156.) Fortune never met any of the other purported partners, and, when he asked about them, Petitioner would become evasive. (*Id.* at 148, 157, 160.) At his offices, Petitioner kept business cards in his name and in the name of "Kent Harrison," one of the purported partners. (*Id.* at 157-58.) Petitioner also had a stamp in the name of "Kent Harrison," which Fortune saw Petitioner use.[5] (*Id.* at 157-60.)

Fortune's responsibilities included reviewing clients' payment records and immigration documents, as well as meeting with clients and prospective clients. (*Id.* at 149-51, 173, 177, 181.) According to Fortune, Petitioner instructed him to ask prospective clients how long they

---

[4] In or around February or March 1998, shortly before firing Fortune, Petitioner changed the firm's name to "Immigration Reform and Research Advocates." (Tr. Vol. I at 164.) He explained to Fortune that he had taken over the firm because the other partners had left, supposedly because they were upset that clients were not paying their bills. (*Id.*)

[5] There is no record of anyone named Kent Harrison licensed to practice law in New York. (Tr. Vol. II. at 315.)

7

had been in the United States, whether they or their family members had filed documents with the I.N.S., and questions concerning their employment status and income level. (*Id.* at 152.)

In addition, Petitioner instructed Fortune to tell clients that Petitioner was their "lawyer." (*Id.* at 155.) Indeed, Fortune testified that Petitioner required clients to sign a retainer agreement, agree to a fee schedule, and make an initial deposit. (*Id.* at 152-54.) According to Fortune, Petitioner accepted payments from clients by cash, check or money order made payable to his name. (*Id.* at 154-55.) Fortune deposited these payments into an account at Dime Savings Bank on a weekly basis. (*Id.* at 155.) When a client did not make a payment on time, Petitioner had Fortune call and send a letter to the client. This letter, written by Petitioner, warned that Petitioner would "pursue both criminal and civil" actions against the client. (*Id.* at 149, 162-63.) The letter also read: "[Petitioner] will make an appearance when your case is called and affirm before an immigration judge that this firm no longer represents you because you do not meet one of the basic requirements to seek immigration relief for which you have applied because you are not a person of good moral character." (*Id.* at 163.)

Between 1996 and June 1, 1998, Petitioner accepted payment from at least 19 people to be their attorney in immigration matters. Most of these former clients testified that they learned of Petitioner's services through his advertisements in newspapers and radio shows targeting Carribean audiences. (Tr. Vol. II at 366-367, 618-619, 641-42, 779-80, 827-28, 984; Transcript of proceedings held on June 8, 1999 before the Honorable John Stackhouse ("Tr. Vol. III"), at 1022, 1135-36,1177, 1328, 1364-65, 1392-93.) While one former client testified that she presumed that Petitioner was a lawyer after seeing his advertisements (Tr. Vol. II at 604-05), many testified that Petitioner expressly told them that he was a lawyer (*see, e.g.*, Tr. Vol. I at 195; Tr. Vol. III at 1367).

Petitioner's clients ended up paying him thousands of dollars for his services.[6]  (*See, e.g.*, Tr. Vol. I at 196, 200, 214; Tr. Vol. II at 984-86, 989-90.)  In some cases, Petitioner made threatening calls to clients and sent them letters accusing them of failing to pay, even when clients had, in fact, already paid in full.  (Tr. Vol. II at 617, 622.)  Petitioner also filed civil court complaints against several clients for amounts that they allegedly had not paid.  (Tr. Vol. II at 675-76, 837-38; Tr. Vol III at 1185-87.)

In return for these payments, Petitioner promised his clients that he would improve their immigration status, sometimes telling them that they would receive green cards within months after hiring him.  (*See, e.g.*, Tr. Vol. II at 617; Tr. Vol. III at 1397.)  Yet many former clients testified that Petitioner had urged them to file (or filed on their behalf) paperwork that initiated deportation proceedings against them, thus leaving them worse off than before his representation.  (*See*, *e.g.*, Tr. Vol. II at 987; Tr. Vol. III at 1066-67, 1075-76.)  Petitioner, it seems, planned to pursue "last-resort" avenues of relief from deportation that are typically pursued only when someone is in deportation proceedings and has few or no other options.  His clients, however, did not qualify for these forms of relief.  On one occasion, for example, Petitioner told a client that she only needed character references to support her application for relief from deportation; the client later learned that, in fact, she needed a qualified relative – which she did not have – to sponsor her.  (Tr. Vol. III at 1379.)  In other cases, it appears that Petitioner never actually filed the applications he had promised to file, essentially abandoning his clients.  (Tr. Vol. I at 249-250; Tr. Vol. II at 518.)  On forms that Petitioner did submit to the I.N.S., he often stamped "Kent Harrison" as the name of the attorney and included a stamp

---

[6] The evidence used to support Petitioner's convictions showed that Petitioner received payments from clients ranging from $2,400 to over $6,000.  (*See* Resp. Mem. at 62.)

bearing the name "Fox, Stewart, Van Stuyvesant, Harrison and Tate." (*See, e.g.*, Tr. Vol. II at 883; Tr. Vol. III at 1334-36.)

A number of Petitioner's former clients testified at trial, describing how Petitioner had misrepresented his qualifications to them, accepted payments from them, and either neglected their cases or taken steps that worsened their immigration positions. For example, one former client, Elizabeth Idoko ("Idoko"), testified that Petitioner told her that he was an immigration lawyer with 18 years of experience and agreed to represent her until she obtained a green card. (Tr. Vol. I at 195, 202.) Petitioner initially told Idoko that his fee was $4,000, but in the end Idoko paid Petitioner a total of $5,580, making the payments at Petitioner's Worth Street office. (*Id.* at 196, 200, 202, 214.) When Petitioner represented Idoko in immigration court, he signed a notice of appearance on her and her children's behalf with the name, C. Elliot Van Stuyvesant. He also checked off a box on the form next to a statement that read, in part: "I am an attorney and a member in good standing of the bar of the Supreme Court of the United States or the highest court of the following states . . . ." (Tr. Vol. II at 511-16; 573-74.) In the blank space next to that statement, Petitioner wrote "NYC, CT, NJ, DC," which according to the testimony at trial, the immigration judge understood to mean that Petitioner was admitted to practice in those jurisdictions. (*Id.* at 514.)

At Idoko's hearing, the immigration judge told Petitioner that he would give him two to three months to enter an application to suspend deportation for each family member; the judge would then suspend the case for eight or nine months. (Tr. Vol. II at 517.) Despite agreeing to that arrangement (*id.*), and later telling Idoko that he had submitted her applications (Tr. Vol. I at 248-49), Petitioner, in fact, never filed Idoko's applications (*id*). At the next hearing, Petitioner did not appear, and Idoko was instead represented by a woman who claimed she was a lawyer

10

and Petitioner's associate. (*Id.* at 519.) The woman had no explanation for why the applications were not filed. (*Id.*) Idoko ultimately completed and filed them herself, with no help from Petitioner. (Tr. Vol. I at 248-49.)

## PROCEDURAL BACKGROUND

### A.    Indictment and Pre-Trial Proceedings

After numerous complaints against Petitioner and an investigation by the District Attorney's Office (*see* Tr. Vol. III at 1717), Petitioner was indicted by a grand jury on or about July 28, 1998,[7] and charged with two counts of Scheme to Defraud in the First Degree, five counts of Grand Larceny in the Third Degree, five counts of Grand Larceny in the Fourth Degree, two counts of Attempted Grand Larceny in the Third Degree, and one count of Practicing or Appearing as an Attorney at Law Without Being Admitted and Registered. (*See* Respondent's appellate brief, dated August 2002 ("Resp. App. Br."), at 3, 59, attached to Declaration of Jennifer K. Danburg in Opposition to Petition for a Writ of Habeas Corpus, dated Nov. 7, 2003 ("Danburg Decl.") as Ex. G.)

Following the indictment, Petitioner, proceeding *pro se*, submitted several motions to dismiss the indictment. In motion papers dated August 29, 1998, Petitioner moved to dismiss the indictment on the ground that he had been denied his right to testify before the grand jury, pursuant to CPL Section 190.50. (*See* Resp. App. Br. at 60.) Specifically, Petitioner alleged that he had been precluded from serving statutory notice of his desire to testify by the "fraud and trickery of the District Attorney and by the inaction and ineffectiveness of assigned counsel." (*See id.* (quoting Petitioner's August 29, 1998 motion papers).) On September 28, 1998,

---

[7] *See* Resp. Mem. at 90 (noting July 28, 1998 as the date when the indictment was filed); Resp. App. Br. at 59 (same); *but see id.* at 3 (noting date as July 29, 1998).

Petitioner again moved to dismiss the indictment on the ground that he had been denied his right to testify, this time arguing that the People had been aware of, yet ignored, his request to testify. (*See id.*)  Petitioner renewed his motion to dismiss in papers dated October 20, 1998, in which he alleged that the People had sent him a letter inviting him to testify before the grand jury, but that the letter had been "returned to sender."  (*See id.* (quoting Petitioner's October 20, 1998 motion papers).)  Petitioner also claimed that he had previously made oral and written requests to testify. (*See id.* at 60-61.)  In addition, Petitioner argued in the October 20th motion papers that the prosecutor had forced several witnesses to make false statements before the grand jury.  (*See id.* at 61.)

In a December 17, 1998 proceeding, the Honorable Herbert Altman issued a written decision denying Petitioner's motions to dismiss the indictment, finding that Petitioner had never filed written notice of his desire to testify and that Petitioner's suggestion that the People had actual notice of his intention to testify was unsupported.  (*See id.* at 61-62.)  Justice Altman also found unsupported Petitioner's claims of prosecutorial misconduct.  (*See id.* at 62.)

In this decision, Justice Altman also found that all of the property that the People sought to introduce had been seized pursuant to a search warrant.  (*See* Resp. Mem. at 65.)  Petitioner then informed the court that he had submitted a memorandum of law challenging the validity of the search warrant to Justice Sackett, a criminal court judge presiding over an unrelated case against Petitioner, and that Justice Sackett had said he would pass the memorandum on (presumably to Justice Altman).  (*See id.* at 65; Transcript of proceedings held on December 17, 1998 before the Honorable Herbert Altman ("12/17/98 Tr.") at 4-6.)  Both Justice Altman and the prosecutor said that they had never seen any such memorandum.  (*Id.*)  When Justice Altman offered Petitioner the option of submitting a written motion to controvert the search warrant,

12

Petitioner responded only by asking the court to set a trial date.  (12/17/98 Tr. at 10.)  Explaining that he would not set a trial until he knew that motion practice was complete, Justice Altman specifically asked Petitioner whether he was "waiving further motions." (*Id.*)  Petitioner replied that "there is no need for me to present any motions because I know you're not going to rule according to the C.P.L.  So why waste the Court's time?"  (*Id.* at 11.)  Finding that Petitioner had waived making any further motions, Justice Altman then set a trial date.  (*Id.* at 14.)

### B.    Trial

Petitioner's case proceeded to a pre-trial *voir dire* proceeding before New York Supreme Court Justice John Stackhouse on May 13, 1999 (*see* Transcript of proceedings held on May 13, 1999 before the Honorable John Stackhouse ("5/13/99 Tr.")) and then to trial, before Justice Stackhouse and a jury, on May 19, 1999 (Tr. Vol. I).[8]  Petitioner represented himself with the assistance of stand-by counsel.  (5/13/99 Tr. at 2-3.)  At trial, the prosecution's witnesses included Tony Lynch (Tr. Vol. II at 313), Antonio Fortune (Tr. Vol. I at 145), Wen Cheng (*id.* at 34) and the Honorable Craig De Bernardis, an immigration judge who testified both as an expert in immigration law and as a fact witness (Tr. Vol II at 507, 534).[9]  In addition to these witnesses and the 19 former clients of Petitioner (all of whom testified that Petitioner had held himself out as an immigration attorney and that they had hired and paid him to represent them), the following witnesses also testified for the prosecution:  Lydia Boothman, a senior account executive with Carribean Life newspaper, who identified Petitioner as the person who ran

---

[8] In the record, the transcript of the May 13, 1999 proceedings is bound to, and appears immediately before, the transcript of the May 19, 1999 proceedings (Tr. Vol. I).  (Dkt 14.)

[9] The relevant portions of the testimonies of Lynch, Cheng, and Fortune are summarized in the factual background section, *supra*.  Judge De Bernardis was the immigration judge in Elizabeth Idoko's proceeding; among other things, he testified at trial about Petitioner's role in that proceeding.

advertisements in the newspaper (Tr. Vol. I at 8); Maria Malave, an attorney admitted to practice law in New York State, who testified that she agreed to do "of counsel" work for Petitioner, and that Petitioner told her he was an immigration attorney (Tr. Vol. II at 686-88); and Lawrence Lo, a branch manager at Dime Savings Bank, who testified that Petitioner held accounts at his bank (Tr. Vol. III at 1214, 1220).

In his defense, Petitioner attempted to show that his prosecution was undertaken merely out of vindictiveness by the Office of the Manhattan District Attorney ("D.A."). To support his theory, Petitioner called Manhattan Assistant District Attorney ("A.D.A.") Elise Ruzow ("Ruzow"), who had prosecuted Petitioner for charges of Aggravated Harassment and Criminal Contempt in another matter. (Tr. Vol. III at 1491.) Ruzow testified that, although Petitioner had sent her a letter stating that she was a "dumb, stupid, lousy prosecutor," and "a sorry excuse for a human being," the District Attorney's office did not indict Petitioner in this case in retaliation for this letter. (*Id.* at 1536-37.) Indeed, Ruzow added that she did not handle this case at all, and that the state Attorney General's office and Special Prosecutions Bureau of the District Attorney's Office had instead investigated Petitioner. (*Id.* at 1537.) In addition, David Smith, a former Manhattan A.D.A. involved in the Special Prosecutions Bureau's investigation, testified that he did not conspire with Ruzow to prosecute Petitioner. (*Id.* at 1717, 1735.)

To further support his contention that Ruzow had orchestrated a vindictive prosecution against him, Petitioner called W. Charles Robinson, an attorney who rented out the Worth Street office to Petitioner, and Dexter McKenzie, who had known Petitioner for four years. Both read excerpts from Petitioner's letter to the judge in Petitioner's harassment case. (*See* Resp. Mem. at 38; Tr. Vol. III at 1689-92; Transcript of proceedings held on June 17, 1999 before the Honorable John Stackhouse ("Tr. Vol. IV"), at 1933-41.) In the letter, Petitioner claimed,

14

among other things, that the alleged victim had given the prosecution a false business card bearing Petitioner's name, and that Ruzow was waging a "personal vendetta" against him. (Tr. Vol. IV at 1939-40.)

Petitioner also attempted to refute the charges that he had fraudulently held himself out as an attorney. Upon Petitioner's request, McKenzie read aloud Petitioner's letter to the First Judicial Department Ethics Committee, in which Petitioner asserted that he was a "solicitor of law," and had never held himself out as an "attorney at law." (*Id.* at 1941-42.) Petitioner added in that letter that he was "responsible for a staff of one hundred and seventy-five employees, ten offices, over 400,000 immigration clients nationwide and the continuation of unsolicited clients from the Board of Immigration Appeals on the pro bono basis." (*Id.* at 1959.) McKenzie further testified that he believed Petitioner had never represented himself to be an attorney at law. (*Id.* at 2024.)

Finally, Petitioner called Thomas Chung, an investigator with the District Attorney's Office who participated in the investigation of Petitioner and the search of his home. (Tr. Vol. III at 1751.) Petitioner asked Chung questions about the investigation and, in an apparent effort to show that the documents retrieved from Petitioner's office did not support the prosecution's case, Petitioner questioned Chung specifically about those documents. Petitioner also asked Chung to read an excerpt of the transcript of the criminal proceedings against Petitioner in the harassment case, in which Petitioner claimed that the business card alleged to be his was fake. (*Id.* at 1741.) As to Chung's search of Petitioner's home, Petitioner asked Chung whether he had a search warrant to enter the home; Chung replied that a man named Duane permitted investigators to enter. (Tr. Vol. III at 1750-51.) Petitioner also sought information from Chung about the role Ruzow played in the investigation. Indeed, throughout the examination, Petitioner

15

returned to what appeared to be the main theme of his defense:  that the investigation and

prosecution of Petitioner stemmed from Rudow's "personal vendetta" against him.[10]

On June 24, 1999, the jury returned a verdict, finding Petitioner guilty of all but one

fourth-degree grand larceny charge, on which the jury deadlocked.[11]  (*See* Resp. Mem. at 41.)

On July 6, 1999, Petitioner was sentenced to an aggregate term of 10 to 20 years, as noted above.

### C.    Section 440.10 Motion

On November 11, 1999, Petitioner, proceeding *pro se*, filed a motion to vacate the

judgment of conviction under Section 440.10 of the New York Criminal Procedure Law.  (*See*

Danburg Decl., Ex. A.)  In his Section 440.10 brief, Petitioner laid out the following 23 grounds

for relief, some of which overlapped:  (1) Petitioner was arrested despite a lack of probable

cause; (2) Petitioner's conviction was based on legally insufficient evidence; (3) Petitioner

received ineffective assistance of counsel because his standby counsel advised him to plead

guilty, withheld exculpatory evidence, moved for a mistrial, and "removed and sanitized" trial

transcripts; (4) Petitioner's conviction was against the "interest of justice"; (5) Petitioner's

indictment was defective because of errors in the grand jury process; (6) Petitioner's Fourth

Amendment right to be free from an illegal search and seizure was violated; (7) the trial court

---

[10] Petitioner also called the following witnesses:  Zamir Iosepovici, an attorney who represented Petitioner in the harassment case and a Bronx County domestic violence case (*id.* at 1556-58); Harriet Boxer, an attorney who went to Petitioner's Worth Street office in April 1998 seeking a refund for a friend who had been one of Petitioner's clients (*id.* at 1652-53); Denise Holgate, an attorney who went to Petitioner's office to discuss the possibility of working together (Tr. Vol IV at 1795-99); and June Allyson-Gray, an accountant who prepared Petitioner's 1997 tax return (*id.* at 1907, 1917-19).

[11] At the conclusion of the government's case and upon the government's motion, the court dismissed the third-degree grand larceny charge concerning Allyson Little, allegedly a former client of Petitioner's, after the prosecutor informed the court that Ms. Little was deceased.  In addition, the deadlocked count, which pertained to Amber Baptiste, who testified that she was a former client of Petitioner's, was also dismissed.  (*See* Resp. App. Br. at 3.)

erred in admitting statements made by Petitioner; (8) Petitioner's was denied his right to a speedy trial; (9) Petitioner's due process rights were violated as a result of the prosecution's "witness tampering"; (10) Petitioner's conviction was obtained as a result of "jury tampering"; (11) Petitioner's rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) were violated based on the People's exclusion of white, college-educated males from the jury; (12) the trial court erred in refusing to grant Petitioner's motion to change venue; (13) Petitioner's conviction was obtained as a result of prosecutorial misconduct; (14) Petitioner's rights under *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), were violated because the prosecution failed to turn over prior statements of witnesses called by the prosecution; (15) Petitioner's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated because the prosecution failed to turn over exculpatory evidence; (16) the trial court improperly exercised jurisdiction over Petitioner, as only the federal court had proper jurisdiction; (17) Petitioner was subjected to "post-arrest delays"; (18) the prosecution obtained Petitioner's conviction through "[f]orged and [a]ltered evidence"; (19) Petitioner's conviction was obtained as a result of "prosecutorial and judicial misconduct"; (20) Petitioner's stand-by counsel engaged in misconduct not on the record; (21) Petitioner's pre-indictment identification procedure was flawed; (22) the trial resulted in a "repugnant verdict"; and (23) the judgment was "vindictive." (*See* Danburg Decl., Ex. A.)

On January 12, 2000, the trial court summarily denied Petitioner's Section 440.10 motion. (Danburg Decl. at Ex. B.) By papers dated February 7, 2000, Petitioner sought leave from the New York Supreme Court, Appellate Division, First Department, to appeal the denial of his Section 440.10 motion. (*Id.* at Ex. C.) On October 10, 2000, leave was granted, and the trial court's denial of the Section 440.10 motion was consolidated with Petitioner's direct appeal. (*Id.* at Ex. E.)

17

D.    **Direct Appeal**

Proceeding *pro se*, Petitioner submitted a brief in the Appellate Division, First Department, in or around September of 2001.[12]  (*See* Appellant's Brief, dated Sept. 14, 2001 ("Pet. App. Br."), attached to Danburg Decl. as Ex. F.)  In a handwritten brief that is often difficult to comprehend, Petitioner appears to have challenged his conviction on the following 10 grounds:  (1) Petitioner's conviction was obtained through legally insufficient evidence, and the jury's verdict was against the weight of evidence; (2) Petitioner's Fourth Amendment rights were violated because the search warrant for Petitioner's office lacked probable cause, and because the government illegally entered and searched Petitioner's home without a search warrant; (3) the indictment was defective because the People denied Petitioner his right to testify before the grand jury and committed errors that tainted the grand jury proceedings; (4) the People improperly withheld *Rosario* material from Petitioner; (5) the People improperly withheld *Brady* material from Petitioner; (6) Petitioner's stand-by attorneys were ineffective and acted under a conflict of interest; (7) Petitioner's appeal was unduly delayed; (8) the state court wrongly exercised jurisdiction over Petitioner; (9) Petitioner's rights under *Batson* were violated; and (10) Petitioner was prevented from presenting an effective appeal because the trial transcript provided to him was incomplete.[13]  In addition, although not in his brief, in his application to the

---

[12] Although Respondent notes that Petitioner filed his Appellate Division brief in August of 2001 (*see* Resp. Mem. at 42), Petitioner's brief actually seems to be have been sent to the court in September of 2001 (*see* Danburg Decl., Ex. F) and accepted for filing in October 2001 (*see* Resp. Mem. at 92; *see* Danburg Decl., Ex. F).  In any event, as noted in this Court's merits analysis of Petitioner's speedy appeal claim, *see infra* p. 75, Petitioner apparently had to submit his brief to the Appellate Division multiple times because of failures to comply with court's rules, before the court finally accepted it for filing.  (*See* Resp. Mem. at 85.)

[13] Respondent's brief in response to Petitioner's Appellate Division brief only addressed six of Petitioner's claims.  (*See* Resp. App. Br.)  Having thoroughly reviewed Petitioner's Appellate Division brief, however, the Court finds that Petitioner alleged four additional claims

Appellate Division for leave to appeal the denial of his Section 440.10 motion, Petitioner asserted claims of jury and witness tampering.  (*See* Danburg Decl., Ex. C.)

By opinion dated September 19, 2002, the Appellate Division unanimously affirmed the judgment of conviction and sentence.  (*See People v. Van Stuyvesant*, 297 A.D.2d 559, 747 N.Y.S.2d 155 (1st Dep't 2002), attached to Danburg Decl. as Ex. H.)  In that opinion, the court first held that the verdict was based on legally sufficient evidence and was not against the weight of evidence.  (*Id.* at 559.)  The court then held that Petitioner's motion to dismiss the indictment on the ground that he was deprived of his right to testify before the grand jury was properly denied by the trial court, as Petitioner had not served notice of intent to testify.  (*Id.* at 560.)  In rejecting Petitioner's claim that his appeal had been unduly delayed, the court found that any delay had resulted from Petitioner's own actions.  (*Id.*)  As to Petitioner's challenge on appeal of the warrant to search his office, the court held that Petitioner had "affirmatively waived his right to submit a motion to controvert the warrant," and was thus precluded from challenging it on appeal.  (*Id.*)  Finally, the court held that Petitioner's remaining claims were "unpreserved or unreviewable" and "decline[d] to review them in the interest of justice."  (*Id.*)  The Appellate Division noted, however, that, "[w]ere we to review these claims, we would reject them."  (*Id.*)

On October 7, 2002, Petitioner, again proceeding *pro se*, sought leave to appeal to the New York Court of Appeals, asserting all of the claims raised to the Appellate Division.  (*See* Danburg Decl., Ex. I.)  In addition, Petitioner raised three new claims (claims 9, 14 and 15 in his habeas petition), not previously raised before the Appellate Division, claims that:  (1) Petitioner was denied his constitutional right to confront the prosecution's witnesses; (2) Petitioner's

---

not accounted for by Respondent.

19

identification by witnesses at trial was improperly "bolstered" by the prosecution; and (3) the

trial court erred by failing to give the jury an alibi charge.  (*Id.*)

On January 14, 2003, the Court of Appeals summarily denied leave to appeal. (*See*

*People v. Van Stuyvesant*, 99 N.Y.2d 586, 755 N.Y.S.2d 722 (2003), attached to Danburg Decl.

as Ex. K.)

### E.    The Habeas Petition

Petitioner timely filed his federal petition for a writ of habeas corpus on April 21, 2003.

(*See* Pet.)[14]  On June 27, 2003, the Honorable Richard C. Casey referred the matter to me for a

report and recommendation.  (Dkt. 3.)  Respondent filed an opposition to the petition on

November 12, 2003 (Dkt. 12), and Petitioner submitted his reply (traverse) on December 1, 2003

(Dkt. 23).  On May 21, 2007, the case was reassigned to the Honorable Lewis A. Kaplan.

(Dkt. 22.)

Although Petitioner has submitted copies of numerous motions, briefs, and other

materials to this Court since the date he filed his petition, none of these materials adds, in any

substantive way, to the arguments raised in his petition and traverse; in fact, at least some of the

materials appear entirely unrelated to this matter.

---

[14] Although the Court's docket reflects a filing date of May 29, 2003 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), this Court will therefore deem the petition to have been filed on April 21, 2003, the date upon which Petitioner signed an affidavit of service by mail, swearing that he mailed his petition to the Court and Respondent. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

**DISCUSSION**

I.    **EXHAUSTION**

A.    **Legal Standards**

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of . . . [the] prisoners' federal rights." *Picard*, 404 U.S. at 275 (citation omitted).

The standards for presenting federal constitutional claims to state courts are not so stringent as to require the recitation of "book and verse on the federal constitution." *Id.* at 278 (citation omitted). The state courts, however, must be "apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.'" *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)) (alteration in original). Petitioners can ensure that state courts are "alerted to the fact that [they] are asserting claims under the United States Constitution," *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995), by presenting their claims in a fashion demonstrating either

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194; *accord Jackson v. Edwards*, 404 F.3d 612, 618-19 (2d Cir. 2005); *see also Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984). Once the state courts are

21

apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citing *Pesina v. Johnson*, 913 F.3d 53, 54 (2d Cir. 1990)), *cert. denied*, 514 U.S. 1054 (1995).

### B.  As "Exhaustion" Is Not Itself an Independent Basis for a Claim, Petitioner's 16th Claim Should Be Dismissed as Non-Cognizable.

As noted above, Petitioner has itemized his habeas claims into 18 numbered sections of his petition and accompanying memorandum.  For his 16th itemized claim, however, Petitioner merely asserts that his various claims have been "exhausted."  As framed, this assertion does not itself state any independent, substantive claim; rather, Petitioner merely seems to be arguing that his claims, in general, are based on federal constitutional violations and are thus reviewable by this Court.  (*See, e.g.*, Pet. at 209.)  Accordingly, the Court will not treat Petitioner's 16th "claim" as a claim *per se*, but rather will consider any arguments articulated therein in connection with determining whether Petitioner has, in fact, exhausted his remaining claims.

### C.  Four of Petitioner's Remaining Claims Are Unexhausted and Procedurally Barred.

Respondent does not dispute that Petitioner "has fully exhausted the majority of the underlying grounds for relief," though Respondent does not identify which claims it believes have been exhausted.  (*See* Resp. Mem. at 46.)[15]  Having reviewing the record, the Court finds that Petitioner has exhausted 13 of the claims he raised in the petition, specifically, the claims

---

[15] Respondent adds that, "[t]o the extent that any of the claims were not raised in state court, such as petitioner's claim about the proprietary of the Appellate Division's opinion, it would be appropriate, given the meritlessness of all of petitioner's claims, for the Court . . . to deny the claims on the merits."  (*Id*.)

numbered as 1-8, 10, 12-13, and 17-18. (*See* Danburg Decl., Exs. C, F, I.) Petitioner fairly

apprised both the Appellate Division and the Court of Appeals of the purportedly constitutional

nature of each of these claims.[16]

This leaves four claims that Petitioner apparently did *not* exhaust in the state courts,

specifically:

> Claim 9 (alleging a violation of Petitioner's Confrontation Clause rights);
>
> Claim 11 (alleging a violation of Petitioner's Fifth Amendment right against self-incrimination);
>
> Claim 14 (alleging that the prosecution improperly "bolstered" the in-court identification of Petitioner by witnesses); and
>
> Claim 15 (alleging that the trial court erred by failing to give the jury an alibi charge).

Of these, Petitioner's 11th claim (alleging a Fifth Amendment violation) is plainly

unexhausted, as Petitioner did not raise such a claim at any stage of the state court proceedings.

Petitioner similarly did not raise his ninth, 14th, or 15th claims before the Appellate Division on

either of his consolidated appeals, although he did seek to raise these claims subsequently, in his

application for leave to appeal to the New York State Court of Appeals. (*See id.* at Ex. I.)  While

this was permissible under state law,[17] it was not sufficient to exhaust the claims for purposes of

---

[16] Petitioner's third claim alleges a *Rosario* violation, which, as discussed below, is not a federal constitutional claim. (*See infra* p. 36.)  Petitioner, however, maintains that the *Rosario* violations in this case "must be analyzed in constitutional terms," specifically invoking the Sixth Amendment and 14th Amendment of the United States Constitution. (*See* Pet. at 45.)

[17] *See* N.Y. Crim. Proc. § 470.35(1) (providing that "[u]pon appeal to the court of appeals from an order of an intermediate appellate court affirming a judgment . . . of a criminal court, the court of appeals may consider and determine not only questions of law which were raised or considered upon the appeal to the intermediate appellate court, but also any question of law involving alleged error . . . in the criminal court proceedings resulting in the original criminal court judgment . . ., regardless of whether such question was raised . . . upon the appeal to the intermediate appellate court").

federal habeas review, as the Court of Appeals did not then consider the claims.  *See Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000) ("Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it.") (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also Ellman v. Davis*, 42 F.3d 144, 148 (2d Cir. 1994) ("The submission of claims to the state court on discretionary review does not automatically constitute the fair presentation of petitioner's claims.  Only where the state court exercised its discretion and ruled on the merits will the exhaustion requirement be satisfied.") (citation omitted); *People v. Byrne*, 77 N.Y.2d 460, 464-65, 568 N.Y.S.2d 717, 718 (1991) ("A denial of leave to appeal to the Court of Appeals by an individual Judge or Justice does not represent a determination on the merits.").  Moreover, Petitioner did not, in any state court, present his 14th claim (regarding "bolstering") in federal constitutional terms, so any federal claim that Petitioner may now be trying to assert in this regard is unexhausted for this reason as well.  *See Daye*, 696 F.2d at 194.

Where federal habeas claims are unexhausted, but the petitioner no longer has any available avenue to pursue those claims in state court, this Court will "deem" the claims exhausted.  *See Castille*, 489 U.S. at 351; *Bossett*, 41 F.3d at 828-29; *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991).  Here, it appears that Petitioner could have raised each of his unexhausted claims on his direct appeal to the Appellate Division, but he opted not to do so, and he is not now entitled to a second direct appeal.  *See Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (remedies in New York State courts no longer available because "[petitioner] has already taken his one direct appeal, and [his] claim is procedurally barred from consideration in a collateral attack on his conviction), *cert denied*, 166 L. Ed. 2d 740 (2007).  Petitioner is also

24

foreclosed from raising the claims collaterally in another Section 440.10 motion. *See* N.Y. Crim. Proc. § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal). Nor can he seek state review of these claims pursuant to either a writ of error *coram nobis*, *see People v. Gordon*, 183 A.D.2d 915, 584 N.Y.S.2d 318 (2d Dep't 1992) (*coram nobis* relief only available for claims of ineffective assistance of appellate counsel) (citation omitted), or a state writ of habeas corpus, *see People ex rel. Allah v. Leonardo*, 170 A.D.2d 730, 565 N.Y.S.2d 331 (3d Dep't 1991) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal) (citations omitted). Thus, Petitioner now has no procedural recourse to New York's courts to advance these unexhausted claims.

Where, however, a claim is deemed exhausted because of a state procedural bar, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim." *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *see also Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir. 2001). Petitioner's unexhausted claims are therefore procedurally barred from habeas review by this Court, and cannot be reviewed unless Petitioner can overcome the procedural bar, by showing either (1) both cause for failing properly to raise the claim in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this instance, Petitioner has not satisfied either standard.

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz*, No. 99 Civ. 12015 (AGS) (JCF), 2001 WL 246437, at *8 (S.D.N.Y. Mar. 7, 2001).  Cause for a default exists where a petitioner can show that (1) "the factual or legal basis for a claim was not reasonably available to counsel," (2) "'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett*, 41 F.3d at 829 (citation omitted).  "Prejudice" requires Petitioner to demonstrate that the alleged constitutional error worked to Petitioner's "*actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  In this case, Petitioner cannot demonstrate any "cause" for his procedural default.  He has not shown – and cannot show – that the factual or legal basis for his defaulted claim was not reasonably available at the time of his direct appeal.  Nor has Petitioner alleged, and there is no evidence suggesting, that his failure to raise the claim on direct appeal resulted from either interference by state officials or ineffective assistance of appellate counsel.[18]

Petitioner has also not shown "a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman*, 501 U.S. at 750).  This second exception to the procedural bar is quite narrow; it is "concerned with actual as compared to legal innocence." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  Thus, to meet this standard, a petitioner would have to show that "a constitutional violation has probably resulted in the conviction of one who

---

[18] As Petitioner cannot show cause for his procedural default, this Court need not reach the question of whether Petitioner can show prejudice.  *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.").

is actually innocent." *Carrier*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Here, Petitioner has offered no evidence, scientific or otherwise, showing his actual innocence.

For these reasons, Petitioner has not demonstrated that he can overcome the procedural bar to this Court's consideration of his four unexhausted claims (claims 9, 11, 14, and 15), and thus the Court should dismiss these claims as procedurally defaulted. Yet even if these claims were reviewable by this Court, they would be subject to dismissal on the merits, as discussed below.

## II.    PETITIONER'S CLAIMS SHOULD BE DISMISSED AS WITHOUT MERIT.

### A.    Standard of Review

In reviewing Petitioner's various claims on the merits, this Court must apply different standards of review, depending upon whether the state courts have previously adjudicated the claims on the merits. Where there is such a prior adjudication on the merits, this Court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court clarified the meaning of the "contrary to" and "unreasonable application" clauses of AEDPA Section 2254(d)(1). A state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent, *id*. at 405, or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result, *id*. at 406. An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). "[T]he state court's decision must have been more than incorrect or erroneous" – rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).[19]

---

[19] AEDPA also provides that, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, a federal court reviewing a habeas petition may not revisit the state fact-finder's credibility determinations. *See Jackson v. Conway*, 448 F. Supp. 2d 484, 451 (W.D.N.Y. 2006) (citing *Marshall v. Lonberger*, 459 U.S. 422, 432-35 (1983)).

By contrast, where this Court reaches the merits of a claim that has not been decided by the state court on substantive grounds, the pre-AEDPA *de novo* standard of review applies. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

In this case, the Appellate Division adjudicated only a few of Petitioner's claims on the merits, requiring a deferential review by this Court. With respect to Petitioner's fourth claim, in which he challenges the evidentiary support for the verdict, the Appellate Division explicitly found that the jury's verdict "was based on legally sufficient evidence and was not against the weight of evidence," and further held that "[i]ssues of credibility were properly considered by the jury and there [was] no basis upon which to disturb its determinations." *Van Stuyvesant*, 297 A.D.2d at 559, 747 N.Y.S.2d at 156.

With respect to Petitioner's sixth claim, in which Petitioner asserts that he was denied his due process rights because of multiple deficiencies in the grand jury process, the Appellate Division addressed one portion of the claim on the merits – specifically, that portion in which Petitioner alleged held that he was deprived of his right to testify before the grand jury. The Appellate Division held that Petitioner was "properly denied" that right because, as Petitioner conceded, "he had not served notice of intent to testify, and his claim that the People had been provided with actual notice of intent was unsupported." *Van Stuyvesant*, 297 A.D.2d at 559-60, 747 N.Y.S.2d at 156.

Finally, the Appellate Division ruled on the merits of one aspect of Petitioner's 18th claim, in which Petitioner alleges that he was denied both a speedy trial and a speedy appeal, as well as his due process rights, due to a pre-indictment delay. The Appellate Division specifically adjudicated Petitioner's speedy *appeal* claim on the merits, holding that "[w]hile defendant

claims that his appeal has been unduly delayed, any such delay is attributable to his own actions." *Id.*

With the exception of these three claims (or portions of claims), which, if they are cognizable in this Court, must be reviewed under the AEDPA standard, the remainder of Petitioner's habeas claims were not decided on the merits by the state courts. Thus, if this Court reaches the substance of those remaining claims, it must review them *de novo.*

### B. Petitioner's Claims

### 1. Lack of Jurisdiction of the State Court

Petitioner argues that the state court improperly exercised jurisdiction over him. (*See* Pet. 1.) Specifically, Petitioner appears to assert that because his crimes involved his appearances before federal immigration judges, the federal government had exclusive jurisdiction to prosecute this case.

Petitioner's argument is without merit. First, even if the federal government had jurisdiction over him, Petitioner's prosecution in state court would not have been necessarily foreclosed. *United States v. Sewell*, 252 F.3d 647, 651 (2d Cir. 2001) ("According to the principle of dual sovereignty, 'a defendant in a criminal case may be prosecuted by more than one sovereign without violating principles of double jeopardy.'") (citing *United States v. Arena*, 180 F.3d 380, 399 (2d Cir. 1999)). Moreover, it appears that Petitioner is confusing immigration law matters, over which the federal government retains exclusive jurisdiction, for the crimes he was convicted of in this case, all of which were crimes under New York State law. (*See* Resp. Mem. at 50.) And, as the record amply demonstrates, Petitioner committed at least one element of each of those crimes in New York State. (*Id.*) Thus, under New York State law, the New

York County District Attorney was authorized to prosecute him. *See* New York Criminal Procedure Law §§ 20.20, 20.40. Contrary to Petitioner's claim, then, the state courts did not lack jurisdiction in this case.

Accordingly, Petitioner's improper jurisdiction claim has no merit, and I recommend its dismissal.

### 2.    Prosecutorial Misconduct

#### a.    Failure to Disclose *Brady* Material

Petitioner's first claim of prosecutorial misconduct is made pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Information falling within the scope of the *Brady* rule "includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The prosecution's obligation to make such disclosures, however, is limited to evidence that is "material." *Id.* at 256 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S.

31

419, 433-34 (1995) (citation omitted).  "In other words, evidence is material if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998) (quoting *Kyles*, 514 U.S. at 435).  Impeachment evidence is material "where the witness in question supplied the only evidence linking the defendant to the crime" or "where the witness supplied the only evidence of an essential element of the offense."  *Avellino*, 136 F.3d at 256-57 (citations omitted). Impeachment evidence is *not* material where it would "not likely . . . have changed the verdict," even though the evidence might have been "useful to the defense."  *Giglio*, 405 U.S. at 154.  In other words, a showing of prejudice is an essential component of any "true *Brady* violation." *Strickler v. Green*, 527 U.S. 263, 281-82 (1999) (citations omitted).

In this case, Petitioner argues that the prosecution violated its *Brady* obligations by withholding various I.N.S. documents related to Petitioner's former clients, including notices to appear before the I.N.S.  (*See* Pet. at 13.)  Although Petitioner states that the prosecution invited him to the D.A.'s Office "presumably to identify the *Brady* material which was supposedly going to be released to [Petitioner]," (*id.*), he maintains that the prosecution never actually intended to release the material, and that the invitation was merely "a ploy to . . . interrogate the defendant without counsel present."  (*See id.* at 15.)

Despite these assertions, Petitioner has made no showing that any *Brady* material was in fact withheld or that any invitation to identify files at the District Attorney's Office was simply part of a "ploy" by the prosecution.  Indeed, the prosecution noted on the record that he had provided Petitioner with certain I.N.S. files, and that Petitioner had come to the D.A.'s Office several times to review the prosecution's pertinent files.  (5/13/99 Tr. at 15-16.)  Moreover, at

32

trial, Petitioner appears to have acknowledged that he *had* received *Brady* materials from the prosecution. During a colloquy, Petitioner noted that he had been given "a whole set of *Rosario* and *Brady* material." (Tr. Vol. III at 1116-17.) According to Petitioner, however, that material was taken from him (or lost) when he was moved from one correctional facility to another. Petitioner stated on the record that, because he was "moved from one jail to another jail, . . . . most discovery that the People have given to me, they'd taken away from me." (*Id.*) The prosecutor responded by noting on the record that he had provided Petitioner with extra copies of at least some of the documents previously disclosed, and that, in any event, the prosecution did not cause any loss of materials while Petitioner was being moved. (*Id.* at 1129-30.) Petitioner does not argue in his habeas submissions that any *loss* of *Brady* material provided by the prosecution, as a result of his move to a new correctional facility, amounted to a violation of the prosecution's *Brady* obligation.

In any case, even if Petitioner were able to show that the prosecution failed to disclose certain evidence (or that certain evidence was removed from him while he was incarcerated), his argument that this evidence was "favorable" and "material" would fail. Petitioner's chief argument is that the documents at issue were exculpatory because they would have provided "proof" that his firm performed at least some work for his former clients. (*Id.*) This argument misses the mark. The prosecution did not establish Petitioner's guilt on the theory that he performed no work whatsoever. Rather, the principal theory of the prosecution's case was that Petitioner fraudulently held himself out to be a licensed attorney authorized to practice immigration law, and accepted payments from clients on those false pretenses. (*See* Resp. Mem. at 56.) Furthermore, even if Petitioner is correct that the allegedly undisclosed evidence would

33

have established that he was not the attorney of record at certain immigration proceedings (*see* Trav. ¶¶ 1-2), the prosecution presented numerous witnesses who, as former "clients" of Petitioner, testified that Petitioner had expressly told them that he was an immigration attorney. And, to the extent Petitioner argues that this evidence would have disclosed the immigration status of his former clients, this information was already in evidence, and any additional evidence would have been cumulative.  In sum, Petitioner has failed to establish that the prosecution withheld any evidence at all, much less to demonstrate that the evidence that was favorable and material to his case.

Accordingly, Petitioner's *Brady* claim has no merit and I recommend that it be dismissed.

### b.    False Evidence

In order to prevail on his claim that the prosecution knowingly and willfully manufactured and used false evidence, Petitioner bears the burden of demonstrating that false evidence was in fact used to gain his conviction.  *United States v. Helmsley*, 985 F.2d 1202, 1205-06 (2d Cir. 1993) (prosecutorial misconduct claim based on allegedly false testimony requires defendant to demonstrate, *inter alia*, that "there was false testimony").  Petitioner must be able to show that the prosecution knowingly or deliberately used false evidence.  *Clancy v. Comm'r of Corr. Servs., State of N.Y.*, 956 F. Supp. 490, 499 (S.D.N.Y. 1997), *vacated on other grounds*, 141 F.3d 1151 (2d Cir. 1998).  Petitioner must also be able to demonstrate that (1) the false evidence could have affected the judgment of the jury, or (2) the evidence may have had an effect on the outcome of the trial.  *Id.* (citing *Washington v. Vincent*, 525 F.2d 262, 267 (2d Cir. 1975), and *Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987)) ("Prosecutorial misconduct consisting of failure to correct false testimony does not rise to the level of fourteenth amendment

34

violation unless there is a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the trial.")).

Petitioner here offers nothing but blanket assertions that the prosecution knowingly procured and used false evidence such as perjured testimony and fake documents. (*See* Pet. at 30.) As a threshold matter, Petitioner has failed to show that the evidence he complains of was in fact false. And, even assuming that it was, there is simply no support for his assertion that the prosecution deliberately presented it with the knowledge that it was false, much less took an active role in procuring it. Finally, notwithstanding his sweeping accusations, Petitioner fails to establish, or even adequately allege, how the allegedly false evidence could have affected the judgment of the jury or the outcome of the trial.

For these reasons, I recommend the dismissal of Petitioner's false evidence claim.

### 3.    Failure to Disclose *Rosario* Material

Petitioner's third claim, made pursuant to *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), derives from state law. In *Rosario*, the New York Court of Appeals established that a defendant is entitled to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness' testimony. 9 N.Y.2d at 289-91, 213 N.Y.S.2d at 450-51. That rule was later codified as New York Criminal Procedure Law § 240.45(1)(a). If the prosecution fails to disclose so-called *Rosario* material, the defendant may be entitled to a reversal of the conviction or some other sanction, depending on the circumstances of the failure to disclose and the content of the material. *See People v. Martinez*, 71 N.Y.2d 937, 940, 528 N.Y.S.2d 813, 815 (1988); *see also* N.Y. Crim. Proc. § 240.70.

It is clear, however, that a violation of this rule does not implicate a federal constitutional right.  "To the extent that [Petitioner's] claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of *federal* law; the obligation to turn over *Rosario* material arises under *state* law."  *Landy v. Costello*, 141 F.3d 1151 (Table), No. 97-2433, 1998 WL 105768, at *1 (2d Cir. Mar. 9, 1998) (emphasis in original); *see also Padro v. Strack*, 169 F. Supp. 2d 177, 180-81 (S.D.N.Y. 2001) ("[P]etitioner's claim that the prosecution's failure to provide defense counsel with the surveillance tapes was a violation of his *Rosario* rights is not cognizable under federal review"); *Bell v. Albaugh*, No. 00 Civ. 1582 (DC), 2000 WL 1877103, at *6 (S.D.N.Y. Dec. 27, 2000) ("[P]etitioner's *Rosario* claim 'is purely a matter of state law,' and thus not cognizable on federal habeas review") (citations omitted); *Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998) ("[T]he failure to turn over *Rosario* material is not a basis for habeas relief.").

 Here, Petitioner argues that because New York State provides for a right to *Rosario* materials, "it must conform the conditioning of that right to the requirements of the due process clause."  (*See* Pet. at 45.)  Yet, although Petitioner insists that his *Rosario* claim must be "analyzed in constitutional terms," (*id.*) the claim remains a state-based claim, and thus it should be dismissed as not cognizable on federal habeas review.

### 4.    Legal Sufficiency of the Evidence

In his fourth claim, Petitioner asserts that the evidence at trial was insufficient to support his conviction beyond a reasonable doubt.[20]  (*See* Pet. at 46.)  Because this is one of the claims

---

[20] Under a liberal reading of the petition, this claim actually consists of two parts: Petitioner claims that the evidence was legally insufficient to support the verdict, and that the verdict was against the weight of the evidence.  (Pet. 46-50).  A "weight of the evidence" claim, however, is purely a matter of state law that does not implicate any violation of the United States

that the Appellate Division adjudicated on the merits, *Van Stuyvesant*, 297 A.D.2d at 559, 747

N.Y.S.2d at 156, the Court will apply the deferential standard of review set forth in AEDPA in

considering the merits of the claim.

On a claim challenging the legal sufficiency of the evidence supporting a guilty verdict,

the petitioner "bears a 'heavy burden' because the government receives the benefit of having all

permissible inferences drawn in its favor." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002)

(internal citations omitted), *cert. denied*, 537 U.S. 955 (2002).  "[T]he critical inquiry on review

of the sufficiency of the evidence to support a criminal conviction must be not simply to

determine whether the jury was properly instructed, but to determine whether the record

evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v.*

*Virginia*, 443 U.S. 307, 318 (1979).  Such an inquiry "does not require a court to 'ask itself

whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"

*Id.* at 318-19 (emphasis in original) (citations omitted).  Rather, "the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Id.* at 319; *see also United States v. Carson*, 702 F.2d 351, 361 (2d Cir. 1983) (a court must

determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and

logically have concluded that the defendant was guilty beyond a reasonable doubt . . . view[ing]

---

Constitution.  *See Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) ("A federal
habeas court cannot address 'weight of the evidence' claims because . . .  the 'weight of the
evidence' argument is a pure state law claim . . . for which habeas review is not available.")
(internal quotation marks and citations omitted).  Accordingly, any such claim should be
dismissed as not cognizable in this proceeding.  *See id.*

the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor") (internal citations omitted), *cert. denied sub nom. Mont v. United States*, 462 U.S. 1108 (1983).  In making this determination, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994) (citation omitted), *cert. denied sub nom. Romano v. United States*, 513 U.S. 1135 (1995).

Furthermore, the jury retains "exclusive[] responsib[ility] for determining a witness' credibility."  *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (citation omitted). "Federal habeas courts are not free to reassess the fact[] specific credibility judgments by juries or to weigh conflicting testimony.  On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution."  *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quoting *Anderson v. Senkowski*, No. 92 Civ. 1007 (CPS), 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992), *aff'd*, 992 F.2d 320 (2d Cir. 1993)).  A petitioner also cannot prevail on a claim that the evidence was legally insufficient to support the verdict merely by showing that the evidence had inconsistencies.  *See, e.g.*, *United States v. Vasquez*, 267 F.3d 79, 91 (2d Cir. 2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility."), *cert. denied*, 534 U.S. 1148 (2002); *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) (insufficiency claim rejected because jury was entitled to believe prosecution witnesses despite inconsistent testimony).  In fact, "[t]he testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt even if that witness's testimony is less than entirely consistent."  *Means v. Barkley*, No. 98 Civ. 7603 (DLC), 2000 WL 5020, at *4 (S.D.N.Y. Jan. 4, 2000) (internal citations omitted).

38

Here, Petitioner was convicted of practicing as an attorney without a license (N.Y. Judiciary L. § 478), engaging in a scheme to defraud (N.Y. Penal L. § 190.65(1)(a), (b)), and various degrees of larceny (N.Y. Penal L. §§ 155.30(1), 155.35) and attempted larceny (N.Y. Penal L. §§ 110.00/155.35).  In advancing his claim challenging the sufficiency of the evidence claim, Petitioner largely rehashes his argument that the prosecution knowingly introduced false evidence at trial.  As explained below, however, the prosecution presented more than sufficient evidence to support each of Petitioner's convictions.

### a.   Practicing as an Attorney Without a License (N.Y. Judiciary L. § 478)

Under N.Y. Judiciary L. § 478, it is unlawful for a person not "regularly licensed and admitted to practice law in the courts of record in [New York State]" to "hold himself out to the public as being entitled to practice law," or "assume, use, or advertise the title of lawyer, or attorney . . . in such manner as to convey the impression that he is a legal practitioner of law."  It is also unlawful for a person, in any manner, to "advertise that he either alone or together with any other persons or person has, owns, conducts or maintains a law office . . . ."  *Id.*  To establish Petitioner's guilt for this count, the prosecution presented evidence of Petitioner's advertisements for his supposed law firm (*see, e.g.*, Tr. Vol. I at 3-11, 27-33), testimony from Petitioner's former clients establishing that they believed Petitioner was an attorney based on his representations (*see, e.g.*, *id.* at 195), and testimony establishing that there was no record of Petitioner being licensed to practice as an attorney in New York State (Tr. Vol. II at 314-15, 318, 357) or to appear before an immigration judge (*see, e.g.*, Tr. Vol. I at 38-40, 93, 120-121, 126; Tr. Vol. II at 314-15, 357).  In addition, the prosecution presented evidence showing that

Petitioner accepted payments from clients to represent them on immigration law matters. (*See, e.g.*, Tr. Vol. II at 617; Tr. Vol. III at 1397.)

In an apparent challenge to the sufficiency of evidence for this conviction, Petitioner argues that every attorney employed by his firm was licensed to practice in New York State (*see* Pet. 56; *see* Trav. ¶ 25), and that "[e]very master calendar and individual hearing was handled by an attorney admitted to practice law." (*See* Trav. ¶ 44) This argument is unavailing, as the question of whether Petitioner employed licensed attorneys does not address whether Petitioner held *himself* out to be an attorney, and there is abundant record evidence, as explained above, that he did. Accordingly, the evidence presented could more than reasonably support a finding of guilt beyond a reasonable doubt for this conviction.

### b.    Scheme to Defraud (N.Y. Penal L. § 190.65(1))

Under N.Y. Penal L. § 190.65(1), to prevail on the scheme to defraud count, the prosecution was required to establish that Petitioner:

> (a) engage[d] in a scheme constituting a systematic, ongoing course of conduct with the intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representations or promises, [and that he obtained] property from one or more of such persons; or (b) engage[d] in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtain[ed] property with a value in excess of one thousand dollars from one or more such persons.

N.Y. Penal L. § 190.65(1).[21] In addition, under either subsection, the prosecution had to "prove the identity of at least one person from whom the defendant so obtained property." *Id.*

---

[21] By suggesting that the prosecution had to establish the elements of *both* subsections (a) and (b) to prove Petitioner's guilt (*see* Resp. Mem. at 62), Respondent appears to overstate the requirements of N.Y. Penal L. § 190.65(1), which sets apart the subsections using the disjunctive "or," therefore permitting the prosecution to prove guilt by establishing the elements of *either* subsection.

Here, the prosecution presented more than sufficient evidence to support a finding of Petitioner's guilt beyond a reasonable doubt under both subsections (a) and (b) of the statute. First, the prosecution established that Petitioner had "engage[d] in a scheme" by presenting evidence that Petitioner advertised his supposed law firm's services on radio stations and in newspapers whose target audience included members of immigrant communities (*see, e.g.*, Tr. Vol. I at 3-11, 27-33), maintained offices in which he met with clients and prospective clients (*see, e.g.*, *id.* at 147, 164, 178), and instructed at least one employee on how to deal with those clients (*see, e.g.*, *id.* at 152). This same evidence could reasonably support the statute's "intent to defraud" element. As for establishing under subsection (a) that Petitioner intended to obtain property from 10 or more individuals, the prosecution presented more than 10 witnesses who testified that they had in fact paid Petitioner for his promises based on his representations of being an immigration attorney.[22]  Finally, to establish under subsection (b) that Petitioner received over $1,000 from at least one person, the prosecution presented evidence showing that Petitioner's former clients paid him amounts ranging from $2,400 to over $6,000 (*see* Resp. Mem. at 62). Thus, the prosecution presented more than sufficient evidence to reasonably support a finding of guilt beyond a reasonable doubt for the scheme to defraud conviction.

> **c.      Larceny (N.Y. Penal L. §§ 155.05(1), (2)(a), 155.30(1), 155.35) and Attempted Larceny (N.Y. Penal L. §§ 110.00/155.35)**

To prove Petitioner's guilt on the larceny charges, the prosecution had to establish that, "with intent to deprive another of property or to appropriate [that property for] himself," Petitioner obtained that property by false pretenses. N.Y. Penal L. § 155.05(1), (2)(a).

---

[22] Accordingly, the prosecution also met the statute's requirement to prove the identity of at least one victim from whom Petitioner had fraudulently obtained property.

Specifically, for the fourth degree grand larceny charges, the prosecution had to establish that, by false pretenses, Petitioner received over $1,000 in payments, N.Y. Penal L. § 155.30(1), and, for the third degree grand larceny charges, over $3,000, N.Y. Penal L. § 155.35. As for the attempted grand larceny charge, the prosecution was required to prove that Petitioner intended to commit larceny and "engage[d] in conduct which tend[ed] to effect the commission" of the larceny. N.Y. Penal L. §§ 110.00/155.35.

As to these charges, a rational jury could have credited the same evidence described above with respect to the scheme to defraud charge and, based on that evidence, found the essential elements of the crimes beyond a reasonable doubt.

In sum, viewing all of the evidence in the light most favorable to the prosecution, the Appellate Division's decision rejecting Petitioner's legal insufficiency claim as to each of the charges against him was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). There is simply no basis in the record for this Court to disturb that determination, and I therefore recommend that this claim be dismissed.

### 5.    Violation of Fourth Amendment Rights

Petitioner asserts that his Fourth Amendment rights were violated on two separate occasions: first, when investigators searched his offices with a warrant; and second, when investigators searched his home without a warrant. (*See* Pet. at 58.) Although it appears that the first portion of this claim – challenging the search of Petitioner's office – is procedurally barred from review by this Court, as the Appellate Division expressly rejected the claim as waived under state law,[23] both portions of the claim are in any event subject to dismissal because

_____

[23] Where the state-law basis for the Appellate Division's rejection of one of Petitioner's claims is clear from the face of the court's decision, and where that decision rests on a state

Petitioner had the opportunity for a "full and fair litigation" of these claims in state court. *Stone v. Powell*, 428 U.S. 465, 494 (1976).

In *Stone*, the Supreme Court established that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494; *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). A federal court "ha[s] no authority to review the state record and grant the writ simply because [it] disagree[s] with the result reached by the state courts" on a Fourth Amendment issue. *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977); *see also Torres v. Irvin*, 33 F. Supp. 2d 257, 264 (S.D.N.Y. 1998) ("A petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a Fourth Amendment claim."). The only time a federal court can review such a claim is where "the state has provided no corrective procedures at all," or the state has provided a corrective mechanism, but the defendant is precluded from

_____

procedural rule that is "firmly established and regularly followed" by the state, the decision will be said to rest on an "independent and adequate" state law ground, barring federal habeas review. *See Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, the state court "must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar'") (citation omitted); *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (to be deemed *adequate*, the court's decision must have been based on a rule that is "firmly established and regularly followed" by the state in question). Here, the Appellate Division expressly found that Petitioner's claim regarding the legality of his office search had been "affirmatively waived," *Van Stuyvesant*, 297 A.D.2d at 560, 747 N.Y.S.2d at 156, and, in reaching this conclusion, it appears that the Appellate Division applied its regularly followed rules regarding waiver, *see, e.g.*, *People v. Baez*, 290 A.D.2d 372, 737 N.Y.S.2d 338 (1st Dep't 2002); *People v. Conte*, 186 A.D.2d 579, 588 N.Y.S.2d 377 (2d Dep't 1992). Accordingly, it appears that Petitioner should now be barred from challenging the propriety of the search of his office in this proceeding. As Petitioner has not shown any basis for overcoming the procedural bar, this aspect of Petitioner's Fourth Amendment claim is subject to dismissal on this ground.

43

using that mechanism "because of an unconscionable breakdown in the underlying process."

*Capellan*, 975 F.2d at 70 (citing *Gates*, 568 F.2d at 840); *Torres*, 33 F. Supp. 2d at 264.

The Second Circuit has not precisely defined under what circumstances an

"unconscionable breakdown" will be found, but it has noted that "a disruption or obstruction of a

state proceeding" would be typical of such a breakdown. *Capellan*, 975 F.2d at 70 (citations

omitted). Furthermore, district courts in this Circuit have held that an "unconscionable

breakdown in the state's process must be one that calls into serious question whether a

conviction is obtained pursuant to those fundamental notions of due process that are at the heart

of a civilized society." *Cappiello v. Hoke*, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (noting as

examples the bribing of a state court judge, the government's knowing use of perjured testimony,

and the use of torture to extract a guilty plea), *aff'd*, 852 F.2d 59 (2d Cir. 1988) (per curiam);

*accord Long v. Donnelly*, 335 F. Supp. 2d 450, 459 (S.D.N.Y. 2004).

Here, although Petitioner asserts that he was denied an opportunity to litigate his claims

"fully and fairly" in state court (*see* Pet. at 71), the record suggests otherwise. During a

proceeding in December 1998, Justice Altman offered Petitioner the chance to make any

motions. (12/17/98 Tr. at 10.) Yet Petitioner declined this opportunity and, as a result, Justice

Altman found Petitioner had waived his right to present any motions. (*Id.* at 10-11.) Thus,

Petitioner certainly had an *opportunity* to litigate his Fourth Amendment claim. *Capellan*, 975

F.2d at 71 (the state court need only grant a petitioner "an *opportunity* for full and fair litigation

of a fourth amendment claim") (citation omitted).

44

As Petitioner cannot demonstrate that the state failed to provide a corrective procedure, or that an "unconscionable breakdown" occurred in that corrective process, his Fourth Amendment claim is not reviewable by this Court, and I recommend its dismissal.

**6.      Deficiencies in the Grand Jury Process and Indictment**

The "sufficiency of an indictment cannot form the basis for . . . a writ of habeas corpus unless the indictment falls below basic constitutional standards." *Carroll v. Hoke*, 695 F. Supp. 1435, 1438 (E.D.N.Y. 1988).  An indictment is constitutionally sufficient when it charges a crime with sufficient detail to inform the defendant of the charges he must meet, and with enough detail that he may assert double jeopardy in a future prosecution based on the same events. *See De Vonish v. Keane*, 19 F.3d 107, 108 (2d Cir. 1994) (citations omitted).  Courts have specifically held each of the following types of claims challenging the sufficiency of an indictment to be not cognizable on habeas review:  a claim that false testimony was presented before the grand jury, *Jones v. Artuz*, No. 97 Civ. 2063 (NG), 2002 U.S. Dist. LEXIS 16603, at *9-10 (E.D.N.Y. Aug. 30, 2002); *see also Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989); that the indictment was supported by insufficient evidence, *Barber v. Garvin*, No. 99 Civ. 88 (JSM), 2000 WL 423639, at *1 (S.D.N.Y. Apr. 19, 2000); that the defendant was denied his right to testify before the grand jury, *Cates v. Senkowski*, No. 02 Civ. 5957 (LAK), 2003 WL 1563777, at *2 (S.D.N.Y. Mar. 17, 2003); and that the prosecutor did not properly instruct the grand jury and did not present exculpatory evidence, *Lopez*, 865 F.2d at 32-33.

In this case, Petitioner argues that he was arbitrarily denied his right to testify before the grand jury, and that his due process rights were therefore violated.  (*See* Pet. at 74.)  In particular, Petitioner maintains that once the State of New York created the right to testify before

45

a grand jury, it could not arbitrarily deny him that right.  (*Id.*)  In addition, Petitioner contends

that his due process rights were violated because the prosecution presented false evidence to the

grand jury.  (*Id.*)  Nonetheless, despite Petitioner's efforts to frame these claims in constitutional

terms, they are, at bottom, state law claims that are not cognizable on habeas review, *see, e.g.*,

*Cates*, 2003 WL 1563777, at \*2; *Lopez*, 865 F.2d at 32, and I therefore recommend their

dismissal.

### 7.      Ineffective Assistance of Standby Counsel

The right to counsel in criminal prosecutions is grounded in the Sixth Amendment.

Because the Constitution "envisions counsel's playing a role that is critical to the ability of the

adversarial system to produce just results[,]  . . . 'the right to counsel is the right to the effective

assistance of counsel.'"  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984) (quoting

*McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  Counsel can deprive a criminal

defendant of this right "simply by failing to render 'adequate legal assistance.'"  *Id.* at 686

(citation omitted).

Despite the constitutional right to counsel, a defendant may waive this right and instead

choose to represent himself during criminal proceedings.  *Faretta v. California*, 422 U.S. 806,

836 (1975).  In such a case, the trial court may appoint standby counsel to assist the *pro se*

defendant.  *Id.* at 834 n.46.  There is, however, "no constitutional right to hybrid representation,"

where the defendant "share[s] the duties of conducting the duties of conducting [his or] her

defense with a lawyer."  *United States v. Schmidt*, 105 F. 3d 82, 90 (2d. Cir. 1997) (citing

*McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)), *cert. denied*, 522 U.S. 846 (1997).  And

"without a constitutional right to standby counsel, a defendant is not entitled to relief for the

ineffectiveness of standby counsel." *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998) (citing *Schmidt*, 105 F.3d at 90).

"As might be expected, a standby counsel's duties are considerably more limited than the obligations of retained or appointed counsel." *Schmidt*, 105 F.3d at 90.  Thus, even where standby counsel plays a role in the trial, such as by examining witnesses and/or delivering the defense summation, such counsel will typically "not play the same role that defense counsel normally would in preparing the strategy for a criminal defense." *Id.*  Where a defendant elects to proceed *pro se*, he may not "assign blame for [his] conviction to standby counsel." *Id.*  Only where "standby counsel [holds] that title in name only and, in fact, act[s] as the defendant's lawyer throughout the proceedings," can a defendant arguably be entitled to press a claim for ineffective assistance of that counsel.  *Id.*

In this case, Petitioner waived his right to counsel and exercised his right to self-representation.  Although his standby counsel may have played some limited role in providing Petitioner advice and occasionally speaking to the Court on Petitioner's behalf on discrete issues, it was Petitioner himself who largely conducted his representation.  Petitioner, for example, made the pre-trial motions, conducted *voir dire*, conducted direct and cross-examination, entered objections, and read his own opening and closing statements.  (*See* Resp. Mem. at 70.) Petitioner's standby counsel certainly did not hold the title of "stand-by" counsel "in name only," and thus Petitioner "may not now assign blame" blame for his conviction to such counsel. *Schmidt*, 105 F.3d at 90.

47

Under the circumstances, Petitioner has no constitutional basis to challenge the effectiveness of his standby counsel, and I therefore recommend that his ineffective assistance claim be dismissed.[24]

### 8.    Denial of Right to Compulsory Process

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."  U.S. Const. Amend VI.  The Supreme Court has recognized that "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."  *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).

The right to compulsory process, however, is not absolute.  Indeed, "the Sixth Amendment can give the right to compulsory process only where it is within the power of the . . . government to provide it."  *Petito v. Artuz*, No. 97 Civ. 8758 (WHP) (KNF), 1999 U.S. Dist. LEXIS 19974, at *15 (S.D.N.Y. Dec. 27, 1999) (quoting *United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962)).  For example, if the prosecution or trial court does not have the ability or jurisdiction to secure the witness's testimony, the right to compulsory process is not violated.

---

[24] To the extent Petitioner alleges that the trial court violated his right to self-representation by appointing standby counsel (*see* Pet. at 119; Trav. ¶¶ 49-51), Petitioner's claim is without merit.  As noted above, the trial court has discretion to appoint standby counsel. The "primary focus" in determining whether a petitioner's right to self-representation was violated "must be on whether [the petitioner] had a fair chance to present his case in his own way."  *McKaskle*, 465 U.S. at 177; *see also Rhagi El v. Artuz*, 105 F. Supp. 2d 242, 253 (S.D.N.Y. 2000).  As explained above, standby counsel here held only a limited role in Petitioner's defense, and Petitioner had more than a "fair chance" to conduct his own defense. Accordingly, any such claim should be dismissed.

48

*Id.*; *Greco*, 298 F.2d at 251 (defendant not denied compulsory process where witness defendant sought to examine was in foreign country); *see also Jacobson v. Henderson*, 765 F.2d 12, 16 (2d Cir. 1985) (no compulsory process violation where witness being sought was not in control of the state, and where the state fully cooperated with defendant in attempting to find witness).

Furthermore, a defendant who alleges a compulsory process violation because of a missing witness "must show the witness would have provided 'favorable evidence which was neither cumulative nor irrelevant.'" *United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002) (quoting *Singleton v. Lefkowitz*, 583 F.2d 618, 623 (2d Cir. 1978)); *see also Moates v. Scully*, No. 83 Civ. 490-CSH, 1985 U.S. Dist. LEXIS 22327, at *4 (S.D.N.Y. Feb. 25, 1985) (the "government's failure to compel the presence of witnesses whose testimony would be cumulative or 'not necessary to an adequate defense' does not violate Sixth Amendment rights'") (quoting *United States v. Taylor*, 562 F.2d 1345 (2d Cir. 1977)).  The defendant's burden lessens if the unavailability of a witness is the prosecution's fault, "but [it] does not disappear altogether." *Desena*, 287 F.3d at 176.

In this case, Petitioner generally asserts that the prosecution prevented potential witnesses from testifying at trial by intimidating them.  (*See* Pet. at 126.)  In particular, Petitioner maintains that two of these potential witnesses, Mary Lawson and Ruth Dowell, would have testified as alibi witnesses for him.[25]  (*See id.* at 130.)

In its brief to the Appellate Division, Respondent acknowledged that "there were various difficulties in bringing defense witnesses before the court." (*See* Resp. App. Br. at 81.)  Yet

---

[25] Specifically, Petitioner says that Lawson and Dowell "could have placed [Petitioner] as far as Hawaii or the Carribean, at the time the fabricated crimes" were "said to have occurred . . . ." (*See* Pet. at 130.)

49

based on a review of the trial transcript where this issue was raised (*see* Tr. Vol. III at 1468-85, 1586-1625, 1774-78; Tr. Vol. IV at 1779-88), it appears that the prosecution made good faith efforts to procure any requested witnesses.  As for Petitioner's allegations of witness intimidation, the prosecutor specifically stated on the record that the People had "not told anyone not to come" to trial (*id.* at 1475), and Petitioner has not presented any evidence in admissible form, such as witness affidavits, to substantiate his allegations to the contrary.  It also appears that, at least to some extent, Petitioner was himself responsible for the fact that certain witnesses did not appear at his trial.  For example, for many of the witnesses he sought to examine, Petitioner apparently provided the court and prosecution with only last-minute notice of the witnesses' names.  The prosecution pointed out at trial that it had "tried to help to get witnesses for defendant on a moment's notice," and had even produced one defense witness who was never included on Petitioner's witness list.  (*Id.* at 1593.)

As for the particular "alibi" witnesses in question, the trial judge noted on the record that Mary Lawson had "fled to Aruba to avoid court process," adding that if Lawson appeared in court he would "have her arrested and charged with criminal contempt . . . ."  (Tr. Vol. IV at 1877.)  If, as suggested by the record, Lawson was out of the country at the time of trial, then the trial court would not have had jurisdiction to compel her appearance in any event.  *See Greco*, 298 F.2d at 251.  Although no similar issue of unavailability was presented with respect to the other purported alibi witness, Ruth Dowell, the record reflects that the trial court instructed Petitioner at one point in the trial to "try to get her for tomorrow" (Tr. Vol. IV at 1783), and that, after that instruction, Petitioner raised no further objection about her failure to appear and sought no remedy from the court, such as a continuance of the trial to allow him more time to produce

the witness, or an order enforcing a subpoena. *See Harvey v. Headley*, No. 98 Civ. 8660 (MBM) (THK), 2000 U.S. Dist. LEXIS 21103, at \*23 (S.D.N.Y. Aug. 31, 2000) (no violation of right to compulsory process where petitioner was "unable to show . . . that he ever asked the trial court to enforce the subpoena").

Finally, in order to prevail on this claim, Petitioner would have to demonstrate that the witnesses who he claims were prevented from testifying would actually have provided him with "favorable evidence." *Desena*, 287 F.3d at 176. Petitioner's contention that Lawson and Dowell would have provided alibi testimony is based on nothing more than Petitioner's own conclusory assertions to that effect. He has pointed to no evidence that he was in fact out of the country at the time of his crimes, and there is substantial evidence in the record to the contrary. Given that Petitioner's criminal conduct spanned at least a 15-month period (*see* Resp. App. Br. at 82), and given the numerous witnesses who testified at trial that they met with Petitioner during that time, there is no reasonable likelihood that the trial outcome would have changed had Lawson or Dowell testified.

Under the circumstances, I recommend dismissal of Petitioner's compulsory process claim.

### 9.    Confrontation Clause Violation

The Confrontation Clause of the Sixth Amendment to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. "The primary purpose of this guarantee is to secure for the defendant the opportunity of cross-examination." *Cotto v. Herbert*, 331 F.3d 217, 229 (2d Cir. 2003) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). The Supreme

51

Court has clarified that, although "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). In general, Confrontation Clause claims "fall into two broad, albeit not exclusive, categories: 'cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of the cross-examination.'" *Kentucky v. Stincer*, 482 U.S. 730, 737 (1987) (citation omitted).

Here, Petitioner does not appear to allege that his case falls into either of these two categories. Indeed, Petitioner has neither identified the admission of any out-of-court statements made by any witnesses he was unable to examine, nor has he alleged that he was barred from cross-examining any witness at trial. Rather, by arguing that he "was denied the right" to examine the "prosecution witnesses before they took the stand," and that the witnesses did not respond to his interrogatories (*see* Pet. at 149), Petitioner seems to be claiming, at most, that he was denied pre-trial discovery. Petitioner, however, is not entitled to federal habeas relief on such a claim, as "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also Moe v. Walker*, No. 97 Civ. 4702 (DC), 1999 U.S. Dist. LEXIS 1099, at *9 (S.D.N.Y. Feb. 5, 1999).

To the extent Petitioner may be challenging any of the trial court's rulings regarding his cross-examination of witnesses, Petitioner has not identified the specific rulings at issue, and there is, in any event, no basis for finding that any such rulings by the court rose to the level of a constitutional violation. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about,

52

among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In this case, there is nothing in the record to suggest that the trial court engaged in any undue restriction of Petitioner's cross-examination of witnesses.

Accordingly, I recommend the dismissal of Petitioner's Confrontation Clause claim.

### 10.    Failure of State Appellate Court to Review Claims

Liberally construed, Petitioner's 10th claim appears to allege that the Appellate Division's refusal to review many of Petitioner's claims on the merits, on the grounds that they were "unpreserved or unreviewable," amounted to a due process violation. Petitioner asserts vaguely that "state procedural rules" were "misinterpreted and specifically [tailored] to prevent[] the state court" from reviewing his claims on the merits.[26] (*See* Pet. at 159.) Petitioner also argues that these rules were not "firmly established and regularly followed." (*Id.*) Petitioner presents no specifics, however, as to how the Appellate Division actually applied any state procedural rules unfairly or arbitrarily, and I therefore recommend dismissal of this claim.

### 11.    Denial of Fifth Amendment Right Not to Testify

The Fifth Amendment prohibits a prosecutor from suggesting to the jury that "'it may treat the defendant's silence as substantive evidence of guilt.'" *United States v. Robinson*, 485 U.S. 25, 32 (1988) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)); *see also Griffin v. California*, 380 U.S. 609, 614 (1965); *Fox v. Mann*, 71 F.3d 66, 72 (2d Cir. 1995) (Fifth Amendment "bars a prosecutor from inviting a jury to draw a negative inference from the defendant's failure to testify) (citing *Robinson*, 485 U.S. at 32; *Griffin*, 380 U.S. at 614). Not all

---

[26] Presumably, Petitioner is referring to those procedural rules the Appellate Division relied upon to find his claims barred from appellate review.

comments about the failure to testify, however, violate the Fifth Amendment, and a particular

comment must be viewed in the context in which it is said.  *Robinson*, 485 U.S. at 33.  "[T]o

prove that a comment violates the rule, a petitioner must establish that the language used was

'manifestly intended . . . or of such character that the jury would naturally and necessarily take it

to be a comment on the failure of the accused to testify.'"  *Bell v. Coughlin*, 778 F. Supp. 164,

176 (S.D.N.Y. 1991) (quoting *United States v. Araujo*, 539 F.2d 287, 291 (2d Cir. 1976), *cert.*

*denied*, *Rivera v. United States*, 429 U.S. 983 (1976)).  In addition, even where a remark is

deemed improper, "a court must consider whether the remark was 'so prejudicial that it denied

the defendant a fair, as opposed to a perfect, trial.'"  *Pearson v. Greiner*, No. 02 Civ. 10244

(RJH) (GWG), 2004 U.S. Dist. LEXIS 22122, at \*38 (S.D.N.Y. Nov. 3, 2004) (quoting *United*

*States v. Rosa*, 11 F.3d 315, 343 (2d Cir. 1993); *see also Fox*, 71 F.3d at 72 (court must examine

whether prosecutor's comment was "'so prejudicial that [it] rendered the trial in question

fundamentally unfair'") (quoting *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990)).

Here, Petitioner argues that his Fifth Amendment rights were violated when, during

summation, the prosecutor read to the jury a brief portion of a letter by Petitioner to the New

York Supreme Court.[27]  As reflected in the trial transcript, at the beginning of his summation, the

prosecutor stated:

> I want to start my summations in sort of an unorthodox way.
> I'm going to read to you a paragraph from Defendant's 37
> page letter that he didn't read to you for some reason, maybe
> you can figure it out.  Right after he spends a couple pages
> attacking [A.D.A.] Elise Ruzow, saying for example, Ms.
> Ruzow would probably be ostracized by the legal community,
> if she has a [r]abbi – he goes on to say the woman's bank of

---

[27] Although it is unclear from the transcript and Respondent's brief, it appears this letter was submitted to the trial judge presiding over Petitioner's criminal harassment case.

> Van Stuyvesant is now closed forever.  I have intention of
> giving into any form of black mail.  I do not give a damn if all
> the women in the world press charges against me.  I will fight
> it and then sue their sorry assess.  I have no intention of giving
> in to the women's court because each day the situation
> continues to cost New York City three million dollars.  I have
> always made my opinion known to this court.  Any first year
> law student, I have an advantage in self representation, I'll
> make my killing in my opening statements and I will bury the
> People in my summations.  I'll not take the stand. . . . .

(Tr. Vol. IV at 2183-84.)  Immediately after reading this portion of the letter, the prosecutor

added:

> This letter from Mr. Van Stuyvesant was written on April 10th,
> 1998, five months before he was arrested.  Think about that, five
> months he thought to himself I'll write a nasty letter about the
> ADA that I know who's talking nasty about me or calling Mr.
> Morgenthau every time there is a prosecution brought against me
> I'll say conspiracy, conspiracy.  I'll have self representation, I'll
> make a killing – self representation from me I'll not take the stand.

(*Id.* at 2184-85.)  At this point, Petitioner objected, although it is unclear on what grounds, as he

stated, "[o]bjection, I don't feel that like anybody would feel sorry for me, Mr. Kale, stick the

straights." (*Id.* at 2185)  The judge appears to have sustained this objection in stating, "[w]ell

that is stricken, the jury will disregard it.  Proceed."  (*Id.*)

Despite Petitioner's assertion that reading the portion of the letter stating that he would

"not take the stand" violated his Fifth Amendment right not to testify (*see* Pet. at 162, 167),

Petitioner is not entitled to habeas relief on this claim.  As an initial matter, Petitioner himself

had introduced this letter as evidence at trial.  (*See* Resp. Mem. at 75; Tr. Vol. IV at 1932.)

Secondly, the particular statements that Petitioner will "not take the stand" must viewed in

context of the remainder of the summation, which made no mention of Petitioner's failure to

testify.[28]  The point of reading part of the letter in summation, Respondent explains, was to

respond to Petitioner's own summation, which had accused the D.A.'s office of a conspiracy,

and to show that "shouting 'conspiracy' was [P]etitioner's modus operandi."  (*See* Resp. Mem. at

77.)  It does appear that Petitioner accused the D.A.'s office of some sort of conspiracy.  (Tr.

Vol. IV. at 2160-61.)  Moreover, in light of the prosecutor's summation comments characterizing

the letter as having demonstrated that Petitioner had planned all along to declare "conspiracy"

(*id.* at 2184-85), it further appears that the prosecutor may well have read this portion of the

letter in order to show Petitioner's tendency to make broad accusations of conspiracy.  Viewing

the summation as a whole, this Court does not believe that a jury would "naturally and

necessarily" interpret the remarks at issue – read from Petitioner's own letter – to be a comment

on the failure of Petitioner to testify.  *Bell*, 778 F. Supp. at 176.  Certainly, this is not a case in

which the "prosecutor's comments on [the defendant's] failure to testify was 'extensive [and]

where an inference of guilt from silence [was] stressed to the jury as a basis of conviction. . . .'"

*Haberstroh v. Montanye*, 362 F. Supp. 838, 841 (W.D.N.Y. 1973) (quoting *Anderson v. Nelson*,

390 U.S. 523, 524 (1968)), *aff'd*, 493 F.2d 483 (2d Cir. 1974).  And even if these isolated

remarks were improper, Petitioner has not demonstrated that they were "so prejudicial" that he

was denied a fair trial.  *Fox*, 71 F.3d at 72.  Accordingly, I recommend the dismissal of this

claim.

### 12.    Violation of *Batson*

Petitioner's 12th claim is made pursuant to *Batson v. Kentucky*, 476 U.S. 79, 84 (1986).

In *Batson*, the Supreme Court reaffirmed the proposition that a state's purposeful exclusion of

---

[28] The prosecution's entire summation is approximately 40 pages of trial transcript.  (Tr. Vol. IV at 2183-2223.)

jurors on the basis of their race violates the Equal Protection Clause.  The Court then established

a three-part burden-shifting analysis for determining whether a prosecutor has impermissibly

excluded jurors based on race.  First, the defendant must "establish a prima facie case of

purposeful discrimination in selection of the petit jury solely on evidence concerning the

prosecutor's exercise of peremptory challenges at the defendant's trial."  *Id.* at 96.  To establish a

*prima facie* case, the defendant must show that:  (1) "he is a member of a cognizable racial

group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire

members of the defendant's race,"[29] and (3) "these facts and any other relevant circumstances

raise an inference that the prosecutor used that practice to exclude the veniremen from the petit

jury on account of their race."  *Id.*  Once the defendant has established a *prima facie* case, "the

burden shifts to the State to come forward with a neutral explanation for challenging [the]

---

[29] In *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991), the Supreme Court, eliminated the requirement that the challenged jurors be of the same race as the defendant.  The Court stated:

> To bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service.
>
> . . . Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.  But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.

*Id.*

jurors." *Id*. at 97. Finally, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id*. at 98.

The Supreme Court stated in *Batson* that a party claiming unconstitutional discrimination in the exercise of peremptory challenges must object in a "timely" fashion, although "the [Supreme] Court has never defined timeliness for a *Batson* claim." *McCrory v. Henderson*, 82 F.3d 1243, 1249 (2d Cir. 1996) (citing *Batson*, 476 U.S. at 99).[30] Under the Second Circuit's interpretation of *Batson*, however, a party forfeits a *Batson* challenge if he does not raise a specific objection, during jury selection, that peremptory challenges are being used in an unconstitutionally discriminatory manner. *See McCrory*, 82 F.3d at 1249 ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); *see also Galarza v. Keane*, 252 F.3d at 638 (2d Cir. 2001) ("[A] party must raise his or her *Batson* challenges in a manner that would allow a trial court to remedy the problem at trial . . . .") (citing *McCrory*); *United States v. Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998) (holding that defendant waived his *Batson* challenge by not raising it at trial until the court had reconvened after the end of jury selection and a lunch recess) (citing *McCrory*); *Leslie v. Artuz*, 72 F. Supp. 2d 267, 275-76 (S.D.N.Y. 1999) (noting that, on habeas review of state conviction, a petitioner's failure to have objected at trial renders *Batson* claim "untimely under Federal law") (citing *McCrory* and *Franklyn*).

---

[30] *See also Ford v. Georgia*, 498 U.S. 411, 423 (1991) (noting that, in *Batson*, the Court "declined . . . to decide when an objection must be made to be timely . . .[,] recogniz[ing] [instead] that local practices would dictate proper deadlines in the contexts of the various procedures used to try criminal cases, and [leaving] it to the trial courts, with their wide 'variety of jury selection practices,' to implement *Batson* in the first instance" (quoting *Batson*, 476 U.S. at 99 n.24)).

Although Petitioner here asserts that the prosecutor violated *Batson* by excluding educated, white men from the jury on the basis of their race, Petitioner never raised a *Batson* objection during the *voir dire* process or even before the completion of trial.[31]  (*See* Resp. Mem. at 78.)  Thus, the trial court had no opportunity to determine as a threshold matter whether Petitioner had established a prima facie case of discrimination in the prosecutor's exercise of peremptory challenges.[32]

Accordingly, Petitioner's *Batson* objection should be barred as untimely and waived, and I recommend the dismissal of this claim.

### 13.   Jury Tampering

In his 13th claim, Petitioner alleges that the prosecution and trial judge tampered with the jury.  (*See* Pet. at 175.)  In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court held that "in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  *Remmer*, 347 U.S. at 229; *accord Sher v. Stoughton*, 666 F.2d 791, 793 (2d Cir. 1981) ("[T]here is no doubt that an unauthorized, ex parte communication with jurors is regarded as 'presumptively prejudicial.'") (quoting *Remmer*).  Indeed, a criminal defendant's Sixth Amendment right to a trial by an impartial jury and right to confront his accusers "are implicated when a jury considers incriminating evidence that was not

---

[31] Although Petitioner contends that his standby counsel "aided and abetted" the prosecution in the *Batson* violation (*see* Pet. at 173), he offers nothing more than vague, conclusory statements in support of this allegation.

[32] Petitioner asserts in his traverse that the "feared *Batson* violation was raised in his pre-trial motions demanding a change of venue . . . ."  (*See* Trav. ¶ 56.)  Yet it is difficult to imagine how Petitioner could have "timely" raised a *Batson* challenge *before* jury selection.  Although Petitioner also notes that he raised a *Batson* challenge in his Section 440.10 motion (*id.*), he does not dispute that he did not raise it during *voir dire* or at any time during trial.

admitted at trial." *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001); *see also Parker v. Gladden*, 385 U.S. 363, 364 (1966) (reversing conviction and holding that court bailiff's prejudicial statements to juror violated defendant's Sixth Amendment rights). Unauthorized *ex parte* communication "generally entails direct communications or meetings of which neither the defendant nor his counsel was informed or had an opportunity to participate or waive defendant's appearance." *Pellington v. Greiner*, 307 F. Supp. 2d 601, 606 (S.D.N.Y. 2004). Even assuming improper *ex parte* communication occurred, however, "it does not necessarily follow that a constitutional error occurred." *Bell v. Coughlin*, 778 F. Supp. 164, 170 (S.D.N.Y. 1991). Constitutional error cannot be shown absent a petitioner's showing that "concrete prejudice" resulted from the conduct; without such prejudice, "there is no basis to disturb a trial verdict." *Id.*; *see also Clark v. Walker*, No. Civ. 5816 (MBM), 1995 U.S. Dist. LEXIS 12249, at *7 (S.D.N.Y. Aug. 24, 1995) (on federal habeas review, a petitioner alleging *ex parte* communication must show "actual prejudice").

In this case, Petitioner's arguments of "jury tampering" and "*ex parte* communication," to the extent they are even comprehensible, are completely unsupported. In addition to his general claim that the prosecutor told the jury "sordid, uncorroborated" information about him (*see* Pet. at 176), Petitioner appears to identify several specific instances that he contends show improper conduct of some sort (*see* Pet. at 176-79; Trav. ¶ 57). For example, Petitioner alleges it was through *ex parte* communication that a "journalist . . . was told that his service as a juror was no longer needed" because Petitioner had accepted a plea. (*See* Pet. at 177; *see* Trav. ¶ 57.) Petitioner also seems to suggest that the prosecutor's summation comments constituted an *ex parte* communication. (*See* Pet. at 178.) Yet, for all of the specific instances that he cites,

Petitioner fails to assert that any particular communication was made outside his presence, or that it constituted a direct or indirect "tampering" with the jury. *Remmer*, 347 U.S. at 229. In any event, Petitioner has scarcely alleged that the challenged conduct was prejudicial, much less demonstrated "concrete prejudice." *Bell*, 778 F. Supp. at 170. Petitioner is not entitled to habeas relief on these bare allegations, and I therefore recommend dismissal of his jury tampering claim.

### 14.    Error by Trial Court in Permitting In-Court Identification Evidence

Petitioner alleges in his 14th claim that the trial court erred in allowing the admission of in-court identification testimony. (*See* Pet. at 181.) In general, where a petitioner merely challenges a state court's evidentiary rulings, this Court cannot consider the petitioner's claims. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1993) ("[R]ulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue."), *adopted by*, 875 F. Supp. 182 (S.D.N.Y. 1995), *aff'd*, 71 F.3d 406 (2d Cir. 1995). Even where a petitioner describes an evidentiary error as unduly prejudicial, it must be recognized that "not all erroneous admissions of [unfairly prejudicial] evidence are errors of constitutional dimension." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998). Indeed, to demonstrate that the admission of evidence by a state trial court constitutes a ground for federal habeas relief, a petitioner "must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude." *Copes v. Schriver*, No. 97 Civ. 2284 (JGK), 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 22, 1997) (citation omitted).

61

In order for an evidentiary error to rise to the level of a constitutional violation warranting federal habeas relief, the petitioner has to show that the alleged error was so prejudicial that it deprived him of a "*fundamentally fair* trial."  *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (quoting *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (emphasis in original), *cert. denied*, 464 U.S. 1000 (l983)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) ("We are not here simply being called upon to apply rules of evidence that might permit the state court in its discretion to grant a new trial but rather are dealing with a more fundamental constitutional concept of fairness.").  For an "erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).  In assessing materiality, the Court must view the evidence "objectively in light of the entire record before the jury."  *Collins*, 755 F.2d at 19.

Here, Petitioner fails to meet his "heavy burden" of showing that any error of constitutional magnitude occurred.  Petitioner's chief argument seems to be that the prosecution "bolstered" the identification testimony offered at trial by coaching witnesses to testify that they had previously made a similar identification (*see* Pet. at 185) from a photo array (*see id.* at 184).  Such bolstering claims, however, have been specifically held to be purely state law claims "not cognizable on federal habeas review."  *Diaz v. Greiner*, 110 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (citations omitted).  Even assuming, *arguendo*, that the trial court erred in allowing bolstering testimony, Petitioner has made no showing that an erroneous evidentiary ruling

deprived him of a "fundamentally fair trial" so as to implicate his constitutional rights, especially given the substantial evidence against him.

Finally, insofar as Petitioner claims that a pre-trial hearing, held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), determined that his pre-trial identification resulted from impermissibly suggestive procedures, he is incorrect. In fact, the record reflects that no such hearing was held. As Respondent correctly notes (*see* Resp. Mem. at 81), after the court confirmed with the prosecution that "there were no police-arranged confrontations" (12/17/98 Tr. at 4), the court declined to hold a *Wade* hearing (*id.*). Thus, to the extent Petitioner claims that the admission of in-court identification testimony violated a ruling made at a *Wade* hearing, Petitioner's argument is without merit.

For these reasons, I recommend dismissal of Petitioner's 14th claim.

### 15. Failure to Give Alibi Charge

In order to obtain a writ of habeas corpus based on an erroneous jury instruction, a petitioner must establish that the erroneous instruction violated a right guaranteed him by federal law. *See Sams v. Walker*, 18 F.3d 167, 171 (2d Cir. 1994) (citations omitted). To do so, a petitioner bears the burden of establishing that the allegedly erroneous jury instruction "so infect[ed] the entire trial that the resulting conviction[] violated due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quotation marks and citation omitted). Moreover, a petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (quotation marks and citation omitted). In determining whether a petitioner has satisfied this burden, a court must be mindful that a single instruction, or lack

thereof, cannot be viewed in isolation, but rather must be viewed in the context of the overall

jury charge.  *See Donnelly*, 416 U.S. at 645 (citation omitted); *Cupp v. Naughten*, 414 U.S. 141,

146-47 (1973) (citation omitted).  As explained in *Donnelly*:

> While this does not mean that an instruction by itself may never
> rise to the level of constitutional error, it does recognize that a
> judgment of conviction is commonly the culmination of a trial
> which includes testimony of witnesses, argument of counsel,
> receipt of exhibits in evidence, and instruction of the jury by the
> judge.  Thus not only is the challenged instruction but one of many
> such instructions, but the process of instruction itself is but one of
> several components of the trial which may result in the judgment
> of conviction.

416 U.S. at 645 (internal quotation marks and citations omitted).  Notably, "[a]n omission, or an

incomplete instruction, is less likely to be prejudicial than a misstatement of the law," and thus a

petitioner's burden in demonstrating that he is entitled to relief as the result of the trial court's

failure to give a particular jury charge "is especially heavy."  *Kibbe*, 431 U.S. at 155.

In this instance, Petitioner asserts that he was denied his due process rights because the

trial court erred by failing to give the jury an alibi charge – which would have made it clear to

the jury that Petitioner bore no burden in proving his alibi[33] – and that, by failing to give this

charge, the court improperly shifted the burden of proof to Petitioner.  (*See* Pet. at 189.)

Specifically, Petitioner argues that the alibi charge should have been given because two

witnesses who he maintains were prevented from testifying, Mary Lawson and Ruth Dowell,

would have testified that Petitioner was out of the country during the much of the time his crimes

were alleged to have occurred.  (*See id.* at 130.)  Respondent, for its part, argues that Petitioner is

---

[33] *See People v. Victor*, 62 N.Y.2d 374, 378, 477 N.Y.S.2d 97, 99 (1984) ("[T]he People
have the burden of disproving an alibi beyond a reasonable doubt, and a Judge must
unequivocally state that burden in the jury charge.").

not entitled to habeas relief on this claim for the very reason that there *was no evidence presented to the jury* that suggested that Petitioner had an alibi, and that an alibi charge would therefore have been inappropriate. (*See* Resp. Mem. at 84; *see also, e.g.*, *People v. Pinkney*, 300 A.D.2d 79, 750 N.Y.S.2d 749 (1st Dep't 2002)("[T]he [trial] court properly declined defendant's request for an alibi instruction, since the evidence did not establish that he was elsewhere at the time that the crime was committed.")).

Respondent further argues that, not only did the trial court commit no error in declining to give the requested charge, but that, viewed in the context of the jury charge as whole, any error in this regard would not have risen to the level of a constitutional violation. (*See* Resp. Mem. at 84-85.) On this point, Respondent refutes Petitioner's argument that the court's jury charge resulted in a shifting of the burden of proof, noting that the court specifically explained to the jury that "Mr. Van Stuyvesant has no burden to prove anything here. The burden of proof never shifts to him. It remains on the People." (Tr. Vol. IV at 2242.) Further, Respondent notes that the court instructed the jury that "the [Petitioner] is entitled to rest upon the presumption of innocence in his favor until that presumption is so far outweighed by the admissible, credible evidence against him that you're firmly convinced of his guilt beyond a reasonable doubt." (*Id.* at 2243.)

Respondents arguments are persuasive. Petitioner has pointed to no evidence in the trial record that would have supported, much less required, an alibi charge. Not only did the supposed alibi witnesses not testify, but Petitioner presented no evidence, such as his passport, to demonstrate that he was traveling at the time that any of the charged crimes were allegedly committed. Moreover, taking the jury instructions as a whole, they do not demonstrate that the

65

court shifted the burden of proof to Petitioner in any way.  Thus, there is no basis to conclude

that the trial court's failure to provide an alibi charge constituted error under state law, much less

rendered Petitioner's trial so unfair that it violated some constitutional right.  *See Donnelly*, 416

U.S. at 645 (considering overall jury charge); *Kibbe*, 431 U.S. at 154.  Accordingly, Petitioner's

claim is not even cognizable on federal habeas review, *see Estelle*, 502 U.S. at 71-72; *Blazic v.*

*Henderson*, 900 F.2d 534, 540 (2d Cir. 1990), and it should be dismissed.

### 16. Petitioner's "Exhaustion" Claim

As explained in Section I(B), *supra*, Petitioner does not state an independent, cognizable

claim in the section of his petition labeled "Exhaustion."

### 17. Failure of Government to Provide a Complete and Accurate Trial Record for Appeal

Once a state "has created appellate courts as 'an integral part of the . . . system for finally

adjudicating the guilt or innocence of a defendants,' . . . the procedures used in deciding appeals

must comport with the demands of the Due Process and Equal Protection Clauses of the

Constitution."  *Evitts v. Lucey,* 469 U.S. 387, 393 (1985) (quoting *Griffin v. Illinois,* 351 U.S. 12,

18 (1956)).  Where, in a federal habeas proceeding, a petitioner contends that the record was

inadequate to permit a constitutionally fair appeal, this Court should consider the extent of the

State's fault in failing to preserve the record, the extent of any prejudice suffered by the

petitioner, and whether the state provided the petitioner with an opportunity to reconstruct what

was lost.  *See, e.g.*, *Laureano v. Sullivan,* No. 88 Civ. 5322 (KMW), 1990 U.S. Dist. LEXIS

18454, at *60-61 (S.D.N.Y. Aug. 16, 1990) (finding no constitutional violation where the loss of

a plea allocution transcript had not been shown to be anything "other than purely fortuitous," the

66

petitioner's claim of prejudice was speculative, and the petitioner chose not to avail himself of a reconstruction hearing in state court), *adopted by* 1991 U.S. Dist. LEXIS 682 (S.D.N.Y. Jan 18, 1991).

Here, Petitioner claims that his due process rights were violated because he was unable to present an effective appeal to the appellate court without a full record of the trial. (*See* Pet. at 213.) Specifically, Petitioner complains that the court reporter, D.A.'s Office, trial court judge, and Presiding Justice of the Appellate Division all "withheld hundreds of pages" of trial transcripts from him. (*See id.* at 214.) These pages were "relevant," Petitioner contends, because they included portions of the trial where Petitioner "preserved issues for appellate review." (*See id.* at 215.) According to Petitioner, this withholding of pages "obstructed [his] ability to prosecute his intermediate appeal on the original records," which, he contends, "was not a harmless error." (*See id.* at 214.)[34]

Notwithstanding these broad allegations, Petitioner fails to demonstrate that transcript pages were in fact missing or withheld. Petitioner, who apparently concedes that he received some, if not most, of the trial transcript prior to his appeal (*see id.* at 215), fails to identify any specific pages that he believes were missing. Given Petitioner's wholly unsubstantiated assertions, the Court has no basis for finding that the transcript provided to Petitioner was actually incomplete, much less that the State acted in "bad faith" in any way. *See Laureano,*

---

[34] Petitioner does not seem to be arguing that the transcript was in any way inaccurate, as opposed to incomplete. Were he to make such an argument, he would have to overcome the "presumption of regularity that attaches" to state trial transcripts, *Bankhead v. LaVallee*, 430 F. Supp. 156, 159 n. 4 (E.D.N.Y. 1977), as well as the certification made by the court reporter that the transcript was true and accurate (Tr. Vol. IV at 2443). Petitioner has not done so; indeed, he has made no showing that errors of any kind were made in the reporter's transcription of the state court proceedings.

1990 U.S. Dist. LEXIS 18454, at *59; *Brock v. Artuz*, No. 99 Civ. 1903 (AJP), 2000 WL 1611010, at *8 (S.D.N.Y. Oct. 27, 2000).  In addition, Petitioner has failed to specify how any purportedly missing pages of the transcript would show that he, in fact, preserved certain issues for appellate review.  As Petitioner's claim of prejudice is purely speculative, this Court cannot, on the record, find that he was deprived of an appeal that comported with constitutional due process.  Accordingly, I recommend that this claim be dismissed.

### 18.    Denial of a Speedy Trial and Speedy Appeal; Pre-indictment Delay

#### a.    Speedy Trial

The right of an accused to a speedy trial is guaranteed by the Sixth Amendment and is imposed upon the states by the Due Process Clause of the 14th Amendment.  *See Klopfer v. North Carolina*, 386 U.S. 213, 22-23 (1967).  Specifically, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."  U.S. Const. Amend. VI.  The speedy trial provision "has no application until the putative defendant in some way becomes an 'accused,'" *i.e.,* when the defendant has been indicted or actually detained.  *United States v. Marion*, 404 U.S. 307, 313, 320 (1971).  In determining whether a defendant has been deprived of his right to a speedy trial, the Court must balance four factors:  (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  *See Barker v. Wingo*, 407 U.S. 514, 530-33 (1972).

The first factor, length of the delay, is "actually a double enquiry."  *Doggett v. United States*, 505 U.S. 647, 651 (1992).  First, "[t]he length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity

68

for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530; *see also Doggett*, 505 U.S. at 651-52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay.") (quoting *Barker*, 407 U.S. at 530-31); *Davis v. McLaughlin*, 122 F. Supp. 2d 437, 442 (S.D.N.Y. 2000) ("Ordinarily, an examination of the *Barker* factors is unnecessary unless the length of the delay is presumptively prejudicial.") (citations omitted). Although "[t]here is no precise amount of delay necessary to trigger an inquiry," *Davis*, 122 F. Supp. 2d at 442, the Supreme Court has noted that, "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n. 1 (1992) (citing Gregory P.N. Joseph, *Speedy Trial Rights in Application*, 48 Fordham L. Rev. 611, 623 n. 71 (1980) (collecting cases)). The Second Circuit, citing the same law review article as the Supreme Court cited in *Doggett*, has seemed to suggest that a delay of eight months might be a workable standard. *See United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) ("One commentator discerns a general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not.").

As for the second inquiry regarding the length of delay, if the defendant makes the threshold showing of presumptive prejudice, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. This "latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*

69

In this case, Petitioner was indicted on or about July 28, 1998, and arraigned in state Supreme Court on August 27, 1998.  (*See* Resp. Mem. at 90.)  His trial began in May 1999, approximately 10 months after the indictment.  (*Id.*)  In light of the standard suggested by *Vassel*, the 10-month delay here is sufficiently lengthy to be considered "presumptively prejudicial" and to require consideration of the other *Barker* factors.  Nevertheless, the length of delay factor does not weigh in Petitioner's favor, as a 10-month delay has still been found to be "relatively short,"  *Wilson v. Goord*, No. 00 Civ. 4849 (LTS), 2004 U.S. Dist. LEXIS 1513, at *16 (S.D.N.Y. Feb. 9, 2004) (citing cases).  In fact, this delay is far shorter than delays in other cases where courts have found no speedy trial violation.  *See, e.g.*, *Barker*, 407 U.S. 514 (five years); *Garcia Montalvo v. United States*, 862 F.2d 425 (2d Cir. 1988) (more than eight years); *Rayborn v. Scully*, 858 F.2d 84 (2d Cir. 1988) (more than seven years); *United States v. McGrath*, 622 F.2d 36 (2d Cir. 1980) (24 months); *United States v. Lane*, 561 F.2d 1075 (2d Cir. 1977) (almost five years); *United States v. Cyphers*, 556 F.2d 630 (2d Cir. 1977) (almost three years); *United States v. Mejias*, 552 F.2d 435 (2d Cir. 1977) (21 months); *United States ex rel. Spina v. McQuillan*, 525 F.2d 813 (2d Cir. 1975) (26 months); *United States v. Lasker*, 481 F.2d 229 (2d Cir. 1973) (two years); *United States v. Infanti*, 474 F.2d 522 (2d Cir.1973) (28 months); *United States v. Fasanaro*, 471 F.2d 717 (2d Cir. 1973) (more than four years); *United States v. Saglimbene*, 471 F.2d 16 (2d Cir. 1973) (six years); *United States v. Schwartz*, 464 F.2d 499 (2d Cir. 1972) (four and one-half years).  Thus, although Petitioner has met the threshold requirement of showing that the pre-trial delay was "presumptively prejudicial," the length of delay factor actually weighs in favor of Respondent.

Next, the Court must consider the reason for the delay.  The Supreme Court has stated that "different weights should be assigned to different reasons."  *Barker*, 407 U.S. at 531.  In particular,

> [a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

*Id.* (citations omitted).  Thus, the speedy trial "standards recognize that pretrial delay is often both inevitable and wholly justifiable," such as where the government "need[s] time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down."  *Doggett*, 505 U.S. at 656.  Petitioner here vaguely asserts, without offering any support, that the prosecution demanded that he undergo "unnecessary" medical examinations in order to delay the start of his trial.  (*See* Pet. at 225.)  Although Respondent correctly points out that there is no evidence that the delays were deliberately caused by the prosecution (*see* Resp. Mem. at 91), Respondent fails to come forward with any justification for the delay, as it is required to do. *See Georgiadis v. Superintendent, Eastern Corr. Facility*, 450 F. Supp. 975, 979-80 (S.D.N.Y. 1978) ("[T]he responsibility for these unexplained delays should rest with the state."), *aff'd,* 591 F.2d 1330 (2d Cir. 1978); *see also Jackson v. Ray*, 390 F.3d 1254, 1262, 1262 n. 3 (10th Cir. 2004) (holding that the State, and not Petitioner, "has the burden to show that the delay is justifiable"; citing *Georgiadis*, 250 F. Supp. 975, and cases from various circuits in observing that "every circuit court to address the question has held that *Barker* places the burden to explain the delay on the State").  Thus, in light of the absence of an explanation for the delay, the Court finds that this factor weighs in favor of Petitioner.

The third factor for the Court to consider is when Petitioner first raised the issue of his right to a speedy trial.  Respondent does not dispute that this factor weighs in Petitioner's favor, acknowledging that "Petitioner did file a motion seeking to dismiss his case based on a speedy trial violation."  (*See* Resp. Mem. at 91.)

Finally, the fourth factor to consider is the prejudice suffered by Petitioner as a result of the delay in bringing him to trial.  "The extent to which a defendant has been prejudiced 'frequently weighs the heaviest in considering a speedy trial challenge.'"  *Warwick v. Kuhlmann*, No. 98 Civ. 6393 (RCC) (HBP), 2002 U.S. Dist. LEXIS 26727, at *51-52 (S.D.N.Y. June 18, 2002) (quoting *Morales v. Keane*, No. CV 94-2379 (RR), 1995 U.S. Dist. LEXIS 22037, at *11 (E.D.N.Y. Apr. 13, 1995)), *adopted by* 2003 U.S. Dist. LEXIS 15067 (S.D.N.Y. Aug. 29, 2003); *see also Quintana v. McCoy*, No. 03 Civ. 5747 (KMK) (JCF), 2004 U.S. Dist. LEXIS 24684, at *16 (S.D.N.Y. Nov. 18, 2004) ("Prejudice is considered to be the most important of the four *Barker* factors."), *adopted by* 2006 U.S. Dist. LEXIS 7638 (S.D.N.Y. Feb. 6, 2006).  "Although 'a showing of prejudice is not a prerequisite to finding a sixth amendment violation, courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice.'"  *United States v. Jones*, 129 F.3d 718, 724 (2d Cir. 1997) (quoting *Rayborn v. Scully*, 858 F.2d 84, 94 (2d Cir. 1988)).

As the Supreme Court has explained, prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," including (1) "prevent[ing] oppressive pretrial incarceration"; (2) "minimiz[ing] anxiety and concern of the accused"; and (3) "limit[ing] the possibility that the defense will be impaired."  *Barker*, 407 U.S. at 532 (citations omitted).  The "most serious" of these interests is the last, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Id*.  For example, "[i]f witnesses die or disappear during a delay, the prejudice is obvious."  *Id*.

72

"[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655 (citations omitted). Rather, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id*. While such presumptive prejudice alone is not sufficient to establish a violation of the Sixth Amendment right to a speedy trial without regard to the other *Barker* criteria, "it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id*. at 655-56. In *Doggett*, the Supreme Court found no need for an affirmative showing of prejudice where the delay was more than eight years. *Id*. In contrast, the delay in this case of 10 months is relatively short – and certainly not extraordinary – and, therefore, the presumption of prejudice is comparatively weak. Thus, it appears that Petitioner must make an affirmative showing of prejudice for this factor to weigh in his favor. *See Vassell*, 970 F.2d at 1165 n.1 (suggesting an affirmative showing of prejudice is necessary in absence of extraordinary delay and government negligence); *see also Davis*, 122 F. Supp. 2d at 443; *Velez v. New York*, 941 F. Supp. 300, 319 (E.D.N.Y. 1996).

Here, Petitioner's claims that he was prejudiced because the delay "disrupt[ed] his employment, drain[ed] his financial resources," and "create[d] anxiety in him, his family and friends" (*see* Pet. at 224) are vague and unsubstantiated.[35] Such unspecific assertions are insufficient to constitute an affirmative showing of prejudice. *See Quintana*, 2004 U.S. Dist. LEXIS 24684, at *17-18 (petitioner's assertion that "he demonstrated anxiety by consistently invoking his speedy trial rights" was not "sufficiently specific" and therefore petitioner's interest

---

[35] Although Petitioner mentions that he was admitted to the hospital for "Post[-]Traumatic Stress Syndrome and stroke," (*id.*) he fails to provide any evidence, such as records of his hospital visit, to support this assertion.

in "minimizing [his] anxiety and concern" was not impinged) (citing *United States v. McGrath*, 622 F.2d 36, 41 ( 2d Cir. 1980) ("[A]ppellants can point to no specific and substantiated prejudice arising from the delay.  The professions of anxiety and concern ... are ephemeral."); *see also Butti v. Goord*, No. 00 Civ. 6521 (DLC) (JCF), 2004 U.S. Dist. LEXIS 21806, at *13 (S.D.N.Y. Aug. 8, 2005) (finding assertions of prejudice "vague and general" where petitioner alleged that he "was forced . . . to live under a cloud of additional suspicion and increased anxiety and humiliation," and that his "business and employment prospects were [] destroyed; his reputation decimated").  Besides these assertions, Petitioner fails to allege any other form of prejudice.  Significantly, Petitioner does not allege that the delay impaired his defense in any way, such as through the loss of key witnesses or evidence.  Nor does he allege that his interest in "prevent[ing] oppressive pretrial incarceration" was impinged.  *See Barker*, 407 U.S. at 532. Based on the record, there is simply no evidence showing that the 10-month pre-trial delay resulted in these forms of prejudice.  As Petitioner has failed to demonstrate any prejudice from the delay, the prejudice factor must be weighed in favor of Respondent.

In sum, while two of the four *Barker* factors – the assertion of right and reason for delay factors – favor Petitioner, the other two – the length of delay and prejudice factors – do not.  Yet, given the particular importance of the prejudice factor, especially in a case with a relatively short pre-trial delay, as in this case, Petitioner's failure to demonstrate prejudice means that he is unable to sustain his speedy trial claim, and I therefore recommend that the claim be dismissed.

### b.    Speedy Appeal

Petitioner also asserts that he was denied his right to a speedy appeal.  (*See* Pet. 219.)  By holding that any delay was attributable to Petitioner, *Van Stuyvesant*, 297 A.D.2d at 560, 747

74

N.Y.S.2d at 156, the Appellate Division addressed this claim on the merits.  Thus, the Court

must apply AEDPA's deferential standard on review.

"[T]he right to a reasonably timely appeal is included among the protections afforded by

the due process clause when a state does provide for an appeal." *Cody v. Henderson*, 936 F.2d

715, 719 (2d Cir. 1991) (citing *Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir. 1990)).  To

determine whether the right to a timely appeal has been violated, courts apply the same factors

developed by the *Barker* court in the speedy trial context.  *Cody*, 936 F.2d at 719; *Brown v.*

*Costello*, No. 00 Civ. 6421 (RCC) (MHD), 2004 U.S. Dist. LEXIS 16159, at *5 (S.D.N.Y.

Aug. 17, 2004).[36]

In this case, as detailed in Respondent's brief to the Appellate Division, Petitioner made a

number of motions after his conviction became final in July 1999.  (*See* Resp. App. Br. at

84-85.)  In addition, it appears that Petitioner had difficulty complying with the Appellate

Division's rules on the filing of appellate briefs, before the court finally accepted his brief for

filing in October 2001.[37]  (*See id.* at 85.)  Even assuming the appellate process could be fairly

characterized as substantially delayed, it is reasonable to conclude that, in light of the record

presented, which Petitioner does not credibly dispute, Petitioner's own actions caused the delay.

Accordingly, the Appellate Division's rejection of Petitioner's speedy appeal claim was neither

---

[36] In applying the length of delay factor from *Barker* in the appellate context, "courts have found appellate delays excessive when the delay constitutes a substantial fraction of the minimum sentence imposed on the appellant." *Brown*, 2004 U.S. Dist. LEXIS 16159, at *6-7 (citing *Simmons v. Reynolds*, 709 F. Supp. 505, 509 (E.D.N.Y. 1989) (finding appellate delay excessive where over six years had passed between petitioner's notice of appeal and the hearing, which constituted over two-thirds of his minimum sentence), *aff'd*, 898 F.2d 865 (2d Cir. 1990)).

[37] The Appellate Division denied Petitioner's appeal in September 2002. *Van Stuyvesant*, 297 A.D.2d 559, 747 N.Y.S.2d 155.

contrary to, nor an unreasonable application of federal law, *see* 28 U.S.C. § 2254(d), and I

recommend that the claim be dismissed.

### c.        Pre-Indictment Delay

The Supreme Court recognized in *United States v. Marion*, 404 U.S. 307, 324 (1971),

that a pre-indictment delay may result in a violation of due process.  *Georgison v. Donelli*,

No. 04 Civ. 1444 (DC), 2005 U.S. Dist. LEXIS 11363, at *20 (S.D.N.Y. June 9, 2005) (citing

*Marion*, 404 U.S. at 324).  "[T]o prevail on a claim of unconstitutional pre-indictment delay, a

petitioner must show that he suffered actual prejudice as a result of the delay and that the delay

was an intentional device to gain a tactical advantage."  *Denis v. Upstate Corr. Facilty*, 361 F.3d

759, 760 (2d Cir. 2004) (citing *Marion*, 404 U.S. at 324.)  The petitioner bears a "heavy burden"

in making such a claim.  *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999).

Here, Petitioner appears to argue that the government denied him his due process rights

because it indicted him many years after he began representing clients on immigration matters.[38]

(*See* Pet. at 229.)  This argument has no merit because, as Respondent correctly points out,

Petitioner was indicted in July 1998 for his conduct between March 1997 and July 1998, and not

for any conduct that occurred many years prior to the indictment.  (*See* Resp. Mem. at 88.)

Respondent further notes that the indictment satisfied the statute of limitations (*id.*), which

Petitioner apparently does not dispute.  Where an indictment is brought within the statute of

limitations, "there is a presumption that the [petitioner] was not prejudiced."  *Georgison*, 2005

U.S. Dist. LEXIS 11363, at *21 (citing *Cornielle*, 171 F.3d at 752).  Petitioner has not only

---

[38] Petitioner is not entirely clear on the length of his alleged pre-indictment delay.  At one point he complains of "unconstitutional pre-indictment delay from 1983-1995 and 1996-1998 . . . ."  (*See* Pet. at 229.)  At another point he contends there was an "18 years delay" in prosecuting the crimes.  (*See* Trav. ¶ 61.)

failed to establish any delay, but he has also failed to demonstrate that he suffered "actual prejudice." *Denis*, 361 F.3d at 760. He has not shown any loss of evidence, or the unavailability of important witnesses or evidence as a result of the alleged delay. *Cornielle*, 171 F.3d at 752 ("[P]rejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness.").

Finally, in connection with this claim, Petitioner again broadly accuses the D.A.'s office of conspiring to prosecute him because of his "activism and advocacy." (*See* Pet. at 221.) Once again, however, Petitioner has offered no support for these assertions. Under the circumstances, I recommend the dismissal of Petitioner's pre-indictment delay claim.

## CONCLUSION

For all of the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL

RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.

*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*,

9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992);

*Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234,

237-38 (2d Cir. 1983).

Dated: New York, New York
       July 9, 2007

                                    Respectfully submitted,

                                      DEBRA FREEMAN
                                      United States Magistrate Judge

Copies to:

Hon. Lewis A. Kaplan, U.S.D.J.

Mr. Curtis Van Stuyvesant, *pro se*
#99-A-4590
Collins Correctional Facility
P.O. Box 340
Collins, New York  14034-0340

Jennifer Danburg, Esq.
Assistant Attorney General
120 Broadway
New York, New York  10271